**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**



**MISSISSIPPI INSURANCE DEPARTMENT,**
**by and through MICHAEL J. CHANEY, COMMISSIONER**
**OF INSURANCE FOR THE STATE OF MISSISSIPPI**          **PLAINTIFF**

**VS.**                                CASE NO. 1: 13cr379 HSo-Rtw

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY; RAND BEERS, in his**
**official capacity as the Secretary of the United States Department of Homeland Security;**
**UNITED STATES** affordability study **FEDERAL EMERGENCY MANAGEMENT**
**AGENCY; W. CRAIG FUGATE, in his official capacity as the Administrator of the United**
**States Federal Emergency Management Agency**          **DEFENDANTS**

**COMPLAINT**

COMES NOW your Plaintiff, the MISSISSIPPI INSURANCE DEPARTMENT ("the

Department"), by and through MICHAEL J. CHANEY, COMMISSIONER OF INSURANCE FOR

THE STATE OF MISSISSIPPI, and files this its Complaint against the Defendants, the UNITED

STATES DEPARTMENT OF HOMELAND SECURITY, RAND BEERS, in his official capacity

as the Secretary of the United States Department of Homeland Security, UNITED STATES

FEDERAL EMERGENCY MANAGEMENT AGENCY, and W. CRAIG FUGATE, in his official

capacity as the Administrator of the United States Federal Emergency Management Agency, and

states as follows:

I.

**NATURE OF THE CASE**

1.      This is an action seeking declaratory and injunctive relief from the "National Flood Insurance

        Program", 42 U.S.C. § 4001, et seq., ("NFIP") as amended by the "Biggert-Waters Flood

        Insurance Reform and Modernization Act of 2012," H.R. 4348 ("BW-12") (collectively "the

Act").

2.      BW-12 was passed in July 2012 and was signed by the President on July 6, 2012. [112 PL 141]. BW-12 extends the NFIP for five years, while requiring significant program reform. The law requires changes to all major components of the program, including flood insurance, flood hazard mapping, grants, and the management of flood plains. Many of the changes are designed to make the NFIP more financially stable, and ensure that flood insurance rates more accurately reflect the real risk of flooding. What the legislation significantly did not address is the effects of the changes on policyholders and the affordability of flood insurance policies for those that truly cannot afford the increases. While there are mandatory studies included in BW-12, specifically, 112 PL 141, § 100236, intended to examine affordability issues with a stated deadline which has come and gone, the study has still not been completed and may not be completed for several years to come. Additionally, there are other studies and reports mandated by BW-12 by specified deadlines which have likewise come and gone and which FEMA has yet to obtain. Without this crucial information, FEMA plainly lacked and continues to lack the necessary information to avoid arbitrary and capricious decision making.

3.      Although there are bills proposed in Congress that would roll back the premiums or lengthen the time policyholders would have to move to full risk premium rates, it is unlikely that Congress will act in time to avoid substantial rate increases scheduled by the Federal Emergency Management Agency ("FEMA") for implementation beginning October 1, 2013.

4.      The passage of BW-12 is perceived as an oncoming economic disaster to Mississippi citizens and other persons having homes or businesses located in a flood zone. Among other

changes, the BW-12 phases out NFIP premium subsidies for owners of homes, repetitive loss properties and others who have been shielded from higher premiums. The law also requires new flood maps, some of which mean properties that were never required to have flood insurance now have to have it. The changes are causing sizable increases in renewal premiums for some property owners and requiring others to purchase flood insurance for the first time. For others, the rising premiums are making it difficult for them to sell their homes. The October 1, 2013 implementation of portions of BW-12 will have a devastating economic impact on the citizens of Mississippi, particularly those regions which are still struggling to recover from Hurricane Katrina.

5.      Under the Administrative Procedure Act ("APA") a federal court possesses the authority to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1). Because the stated purpose of the NFIP is to make "flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection" remains unchanged by BW-12, the Department maintains that FEMA's failure to obtain the various studies and other assistance mandated by BW-12 prior to October 1, 2013 amounts to an "agency action unlawfully withheld or unreasonably delayed" subject to review and remedial action provided for under §706(1) of the APA.

II.

## JURISDICTION AND VENUE

6.      The Court has in personam and subject-matter jurisdiction over the parties and issues involved in this lawsuit. See, e.g., 28 U.S.C. § 1331 (action arises under the Constitution and laws of the United States); 28 USC Sec. 1346(a)(2) (United States as a party defendant); and

28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. §1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."). Furthermore, the Administrative Procedures Act, 5 U.S.C. § 701 et seq., ("the APA") provides for the review of agency actions and authorizes grants of injunctive relief when appropriate, including but not limited to the circumstances described in 5 U.S.C. §702 and §706(1).

7.  Venue is proper before this Court under 28 USC §1391(e) because a substantial number of NFIP policies affected by BW-12 are located on the coastal area, and the Mississippi Insurance Department maintains an office in Gulfport, Mississippi. Furthermore, although citizens of Mississippi throughout the entire State of Mississippi are affected by the issues complained of herein, some of the most egregiously affected persons reside in the Gulf Coast area of the State of Mississippi. The Mississippi Insurance Department regulates and issues privilege licenses for the insurance agents and agencies that sell flood insurance within the State of Mississippi, including both policies procured through the National Flood Insurance Program and also excess or surplus flood insurance policies sold through private companies.

III.

## PARTIES

8.  Plaintiff, the Mississippi Insurance Department, is an agency of the State of Mississippi created by § 83-1-1 of the Mississippi Code of 1972, which provides that the Department of Insurance "shall be charged with the execution of all laws (except as otherwise specifically provided by statute) now in force, or which may hereafter be enacted, relative to all insurance

and all insurance companies, corporations, associations, or orders." Section 83-1-17 of the Mississippi Code of 1972 further empowers the Commissioner to compel compliance with the provisions of Title 83 of the Mississippi Code of 1972 with respect to obligations, prohibitions, and the payment of...fees, and penalties by and upon foreign insurance companies or other insurers ....by suit in the name of the state." Among other things the Department licenses and regulates Mississippi insurance agents and agencies who sell and administer flood insurance coverage under the Act. Furthermore, "[t]he duty and responsibility of the Commissioner of Insurance is prescribed primarily for the protection of policyholders and the public." *Sanders v. Neely*, 19 So.2d 424, at 430 (Miss. 1944). The Commissioner and the Mississippi Attorney General's office have similar authority to enforce the statutory provisions relating to insurance by the institution of suit. *Gandy v. Reserve Life Ins. Co.* 279 So. 2d 648 (Miss. 1973). Michael J. Chaney is the duly elected Commissioner of Insurance for the State of Mississippi, and is the chief officer of the Mississippi Department of Insurance pursuant to § 83-1-3 of the Mississippi Code of 1972.

9.   Defendant, the United States Department of Homeland Security ("DHS"), is an agency of the United States Government, and is responsible for administration of the NFIP through FEMA. DHS is sued by and through Rand Beers, in his official capacity as the Secretary of the United States Department of Homeland Security who may be served with process pursuant to Rule 4 of the Federal Rules of Civil Procedure. FEMA is sued by and through Craig Fugate, the FEMA Administrator, in his official capacity, who may be served with process pursuant to Rule 4 of the Federal Rules of Civil Procedure. FEMA, by way of its director, has the responsibility for providing "by regulation  for general terms and conditions of

insurability which shall be applicable to properties eligible for flood insurance coverage ....".

42 U.S.C. § 4013(a). The regulations, having by now long been promulgated, are contained

in 44 C.F.R. §§ 59.1-75.14 (2013).

IV.

**FACTS COMMON TO ALL COUNTS**

10.    Congress enacted the National Flood Insurance Act in 1968 "in response to a growing

concern that the private insurance industry was unable to offer reasonably priced flood

insurance on a national basis." *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 387 (9th

Cir. 2000). NFIP is a federally-subsidized program designed to make affordable flood

insurance available to the general public in flood prone areas. See *Gowland v. Aetna*, 143

F.3d 951, 953 (5th Cir. 1998). Numerous reasons make it uneconomical for private insurance

companies, by themselves, to provide flood insurance with reasonable terms and conditions;

therefore, Congress authorized the creation of the NFIP "with large-scale participation of the

Federal Government ....". 42 U.S.C. § 4001(b); 4011(a).

11.    Soon thereafter, Congress passed the Flood Disaster Protection Act of 1973, which required

property owners to obtain flood insurance coverage on property located in federally

designated special flood hazard areas in order to qualify for certain assistance or financing.

See 42 § U.S.C. 4012a; *Hofstetter v. Chase Home Fin., LLC*, 2010 U.S. Dist. LEXIS 84050,

2010 WL 3259773, at *4 (N.D. Cal. Aug. 16, 2010). Federally regulated private lenders were

prohibited from making a loan secured by property located in a designated special flood

hazard area unless flood insurance was obtained. 42 U.S.C. 4012a(b)(1).

12.    Congress later enacted the National Flood Insurance Reform Act of 1994, which imposed

further obligations regarding mandatory flood insurance requirements. The Act authorized federally regulated mortgage lenders and servicers to purchase flood insurance for property in special flood hazard areas when borrowers with loans secured by such property failed to purchase the minimum amount of flood insurance required under 42 U.S.C. 4012a(b). Prior to purchasing such insurance, the borrower was required to be given proper notice and an opportunity to purchase insurance for him or herself. 42 U.S.C. 4012a(e). The amount of insurance required was "at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, whichever is less." 42 U.S.C. 4012a(b).

13. Today, the DHS's FEMA administers the program by developing flood hazard maps that are used to set flood insurance rates, regulate floodplain development, and inform those who live in the "100-year" floodplain of potential flood hazards.

14. The recent flooding in Colorado, which has claimed the lives of at least 8 people and damaged more than 19,000 homes, is a stark reminder that flood risk throughout the United States is prevalent, costly, and lethal. It is not confined to the Gulf Coast or any coast for that matter; we find it in every state of the union.

15. Five days from now, FEMA will begin the process of increasing insurance rates on hundreds of thousands of homeowners and small business owners across the United States as a result of BW-12.

16. Implementation of the Act is causing extreme increases in Mississippi's flood insurance rates. Some premiums may increase drastically according to the FEMA Administrator's September 18, 2013 testimony before the Committee on Banking, Housing, and Urban

Affairs of the Senate. See Exhibit A (Written testimony of FEMA Administrator and NFIP Admistrator Craig Fugate before the Senate Committee on Banking, Housing, and Urban Affairs, Subcommittee on Economic Policy hearing titled "Implementation of the Biggert-Waters Flood Insurance Reform Act of 2012: One Year After Enactment"). Mr. Fugate agreed that BW-12 raises affordability issues, but said in response to questioning that his hands are tied. "Let me put my cards on the table, I need your help. I have not found, my attorneys have not found a way ... I do not have the answer you are looking for. I need your help. Without additional legislative support ... I cannot address it," Fugate said. He also said that the affordability study mandated by BW-12 to be delivered to Congress approximately 6 months ago is unlikely to be completed until 2015, but that, in his opinion, the law does not tie the implementation of the reforms to the completion of the study.

17.     It is pertinent that the Act implements a strategy for remapping the country's flood zones, and that the remapping appears to have started with Mississippi. According to FEMA, Mississippi and Louisiana are the first states to include the post Katrina statistics in their rating methodology. See Exhibit B (FEMA Map Showing Progress of Flood Mapping in Coastal Counties of the United States). This means that Mississippi's citizens will be among the first in the nation to have these drastic rate increases imposed, and that Mississippi's citizens will pay them for many years before citizens of other states are required to do likewise.

18.     BW-12 authorizes immediate rate increases on homeowners and businesses that played by the rules and did everything asked of them, before even beginning to study the impacts these rate increases would have on affordability. This was major legislation that passed without

the information necessary to implement it with either compassion or common sense. Approximately 17.4 million households live in Special Flood Hazard Areas (SFHA) where flood insurance is mandatory. According to to the Department of Housing and Urban Development ("HUD"), 41 percent of those households are low-to-median income and could face major difficulties affording rate increases. Those who are already in the program may be forced out, and families considering a first-time home purchase may suddenly find themselves priced out of the market.

19.     The very first provision in the NFIP is the following Congressional finding and declaration of purpose:

> (a)  Necessity and reasons for flood insurance program. The Congress finds that (1) from time to time flood disasters have created personal hardships and economic distress which have required unforeseen disaster relief measures and have placed an increasing burden on the Nation's resources; (2) despite the installation of preventive and protective works and the adoption of other public programs designed to reduce losses caused by flood damage, these methods have not been sufficient to protect adequately against growing exposure to future flood losses; (3) as a matter of national policy, a reasonable method of sharing the risk of flood losses is through a program of flood insurance which can complement and encourage preventive and protective measures; and (4) if such a program is initiated and carried out gradually, it can be expanded as knowledge is gained and experience is appraised, thus eventually *making flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection.*

42 USCS § 4001(a) emphasis added. Consequently, the over-arching purpose of NFIP is to provide *affordable* flood insurance in high-risk areas.

20.     Notwithstanding the congressional purpose enunciated in 42 USCS § 4001(a), the only reference to "affordability" in BW-12 appears in 112 PL 141 § 100236, which mandates the " affordability study" Administrator Fugate referenced in his September 18, 2013 testimony. That section reads:

Sec. 100236. STUDY OF PARTICIPATION AND **AFFORDABILITY FOR CERTAIN POLICYHOLDERS.**

(a) FEMA Study.--The Administrator shall conduct a study of--

(1) methods to encourage and maintain participation in the National Flood Insurance Program;

(2) methods to educate consumers about the National Flood Insurance Program and the flood risk associated with their property;

(3) *methods for establishing an affordability framework for the National Flood Insurance Program, including methods to aid individuals to afford risk-based premiums under the National Flood Insurance Program through targeted assistance rather than generally subsidized rates, including means-tested vouchers*; and

(4) the implications for the National Flood Insurance Program and the Federal budget of using each such method.

(b) National Academy of Sciences Economic Analysis.--To inform the Administrator in the conduct of the study under subsection (a), *the Administrator shall enter into a contract under which the National Academy of Sciences, in consultation with the Comptroller General of the United States, shall conduct and submit to the Administrator an economic analysis of the costs and benefits to the Federal Government of a flood insurance program with full risk-based premiums, combined with means-tested Federal assistance to aid individuals who cannot afford coverage, through an insurance voucher program. The analysis shall compare the costs of a program of risk-based rates and means-tested assistance to the current system of subsidized flood insurance rates and federally funded disaster relief for people without coverage.*

(c) Report.--*Not later than 270 days after the date of enactment of this Act, the Administrator shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report that contains the results of the study and analysis under this section.*

(d) Funding.--Notwithstanding section 1310 of the National Flood Insurance Act of 1968 (42 U.S.C. 4017), there shall be available to the Administrator from the National Flood Insurance Fund, of amounts not otherwise obligated, not more than $ 750,000 to carry out this section.

112 PL 141, § 100236.

21.     As may be seen, 112 PL 141, § 100236 expressly mandated FEMA to contract for and obtain *a specific affordability study that was to take 9-months, cost not more than $750,000 and be delivered to Congress by April of 2013.* Instead, FEMA reportedly did not sign a contract to begin the study until August, 2013- four months after it was due. Indeed, in his September 18, 2013 written testimony, Administrator Fugate candidly admitted:

> Pursuant to the provisions in Biggert-Waters, FEMA is charged with completing a study with the National Academy of Sciences to explore ways to: encourage/maintain participation in the NFIP, methods to educate consumers about the NFIP and flood risk, and methods for establishing an affordability framework for the NFIP, including implications of affordability programs for the NFIP and the Federal budget. The Academy estimates that *it will likely take at least two years to complete the study due to the need to obtain data on policy-holders and their incomes.*

Ex. A (emphasis added).

22.     In addition to 42 USC § 4001(a), supra, there are at least the following other portions of the NFIP which relate to and support the same "affordability" objective:

a.      42 USC § 4014(a)(2) requires as part of FEMA's estimation of premium rates to include consideration of rates which "would be reasonable, would encourage prospective insureds to purchase flood insurance, and would be consistent with the purposes of this chapter." It should be noted that BW-12 § 205 amends this section to remove certain properties from inclusion in the subsidy program;

b.      42 USC § 4015(a)(1) grants FEMA the discretion to set "chargeable rates" at "less than the estimated risk premium rates under section 4014(a)(1) of this title, where necessary."

c.      42 USC § 4015(b) describes what FEMA must consider in setting the chargeable

rates, and paragraph (b)(2) of this section requires that the rate be "adequate on the basis of accepted actuarial principles, to provide reserves for anticipated losses, or, if less than such amount, consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance and with the purposes of this chapter."

23.   For example, 112 PL 141 §100231, reads:

§ 100231. STUDIES AND REPORTS.

(a) Report on Improving the National Flood Insurance Program.--***Not later than 1 year after the date of enactment of this Act***, the Comptroller General of the United States shall conduct a study and submit a report to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives, on--

(1) the number of flood insurance policy holders currently insuring--

(A) a residential structure up to the maximum available coverage amount, as established in section 61.6 of title 44, Code of Federal Regulations, of--

(i) $ 250,000 for the structure; and

(ii) $ 100,000 for the contents of such structure; or

(B) a commercial structure up to the maximum available coverage amount, as established in section 61.6 of title 44, Code of Federal Regulations, of $ 500,000;

(2) the increased losses the National Flood Insurance Program would have sustained during the 2004 and 2005 hurricane [950] season if the National Flood Insurance Program had insured all policyholders up to the maximum conforming loan limit for fiscal year 2006 of $ 417,000, as established under section 302(b)(2) of the Federal National Mortgage Association Charter Act (12 U.S.C. 1717(b)(2));

(3) the availability in the private marketplace of flood insurance coverage in amounts that exceed the current limits of coverage amounts established in section 61.6 of title 44, Code of Federal Regulations; and

(4) what effect, if any--

(A) raising the current limits of coverage amounts established in section 61.6 of title 44, Code of Federal Regulations, would have on the ability of private insurers to continue providing flood insurance coverage; and

(B) reducing the current limits of coverage amounts established in section 61.6 of title 44, Code of Federal Regulations, would have on the ability of private insurers to provide sufficient flood insurance coverage to effectively replace the current level of flood insurance coverage being provided under the National Flood Insurance Program.

(b) 42 USC 4027a Report of the Administrator on Activities Under the National Flood Insurance Program.--

(1) In general.-- The Administrator shall, on an annual basis, submit a full report on the operations, activities, budget, receipts, and expenditures of the National Flood Insurance Program for the preceding 12-month period to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives.

(2) Timing.-- Each report required under paragraph (1) shall be submitted to the committees described in paragraph (1) not later than 3 months following the end of each fiscal year.

(3) Contents.-- Each report required under paragraph (1) shall include--

(A) the current financial condition and income statement of the National Flood Insurance Fund established under section 1310 of the National Flood Insurance Act of 1968 (42 U.S.C. 4017), including--

(i) premiums paid into such Fund;

(ii) policy claims against such Fund; and

(iii) expenses in administering such Fund;

(B) the number and face value of all policies issued under the National Flood Insurance Program that are in force;

(C) a description and summary of the losses attributable to repetitive loss structures;

(D) a description and summary of all losses incurred by the National Flood Insurance Program due to--

(i) hurricane related damage; and

(ii) nonhurricane related damage;

(E) the amounts made available by the Administrator for mitigation assistance under section 1366(c)(4) of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c(c)(4)), as so redesignated by this Act, for the purchase of properties substantially damaged by flood for that fiscal year, and the actual number of flood damaged properties purchased and the total cost expended to purchase such properties;

(F) the estimate of the Administrator as to the average historical loss year, and the basis for that estimate;

(G) the estimate of the Administrator as to the maximum amount of claims that the National Flood Insurance Program would have to expend in the event of a catastrophic year;

(H) the average--

(i) amount of insurance carried per flood insurance policy;

(ii) premium per flood insurance policy; and

(iii) loss per flood insurance policy; and

(I) the number of claims involving damages in excess of the maximum amount of flood insurance available under the National Flood Insurance Program and the sum of the amount of all damages in excess of such amount.

(c) GAO Study on Pre-FIRM Structures.--*Not later than 1 year after the date of enactment of this Act*, the Comptroller General of the United States shall conduct a study and submit a report to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives, on the--

(1) composition of the remaining pre-FIRM structures that are explicitly receiving discounted premium rates under section 1307 of the National Flood Insurance Act of 1968 (42 U.S.C. 4014), including the historical basis for the receipt of such subsidy and the extent to which pre-FIRM structures are currently owned by the same owners of the property at the time of the original National Flood Insurance Program rate map;

(2) number and fair market value of such structures;

Page 14 of 36

(3) respective income level of the owners of such structures;

(4) number of times each such structure has been sold since 1968, including specific dates, sales price, and any other information the Secretary determines appropriate;

(5) total losses incurred by such structures since the establishment of the National Flood Insurance Program compared to the total losses incurred by all structures that are charged a nondiscounted premium rate;

(6) total cost of foregone premiums since the establishment of the National Flood Insurance Program, as a result of the subsidies provided to such structures;

(7) annual cost as a result of the subsidies provided to such structures;

(8) the premium income collected and the losses incurred by the National Flood Insurance Program as a result of such explicitly subsidized structures compared to the premium income collected and the losses incurred by such Program as a result of structures that are charged a nondiscounted premium rate, on a State-by-State basis; and

(9) the options for eliminating the subsidy to such structures.

(d) GAO Review of FEMA Contractors.--The Comptroller General of the United States, in conjunction with the Office of the Inspector General of the Department of Homeland Security, shall--

(1) conduct a review of the 3 largest contractors the Administrator uses in administering the National Flood Insurance Program; and

(2) *not later than 18 months after the date of enactment of this Act*, submit a report on the findings of such review to the Administrator, the Committee on Banking, Housing, and Urban Affairs of the Senate, and the Committee on Financial Services of the House of Representatives.

(e) Study and Report on Graduated Risk.--

(1) Study.----

(A) Study required.--The Administrator shall enter into a contract under which the National Academy of Sciences shall conduct a study exploring methods for understanding graduated risk behind levees and the associated land development, insurance, and risk communication dimensions.

(B) Contents of study.--The study under this paragraph shall--

(i) research, review, and recommend current best practices for estimating direct annualized flood losses behind levees for residential and commercial structures;

(ii) rank each best practice recommended under clause (i) based on the best value, balancing cost, scientific integrity, and the inherent uncertainties associated with all aspects of the loss estimate, including geotechnical engineering, flood frequency estimates, economic value, and direct damages;

(iii) research, review, and identify current best floodplain management and land use practices behind levees that effectively balance social, economic, and environmental considerations as part of an overall flood risk management strategy;

(iv) identify areas in which the best floodplain management and land use practices described in clause (iii) have proven effective and recommend methods and processes by which such practices could be applied more broadly across the United States, given the variety of different flood risks, State and local legal frameworks, and evolving judicial opinions;

(v) research, review, and identify a variety of flood insurance pricing options for flood hazards behind levees that are actuarially sound and based on the flood risk data developed using the 3 best practices recommended under clause (i) that have the best value as determined under clause (ii);

(vi) evaluate and recommend methods to reduce insurance costs through creative arrangements between insureds and insurers while keeping a clear accounting of how much financial risk is being borne by various parties such that the entire risk is accounted for, including establishment of explicit limits on disaster aid or other assistance in the event of a flood; and

(vii) taking into consideration the recommendations under clauses (i) through (iii), recommend approaches to communicate the associated risks to [953] community officials, homeowners, and other residents of communities.

(2) Report.-- *The contract under paragraph (1)(A) shall provide that **not later than 12 months after the date of enactment of this Act,** the National Academy of Sciences shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services and the Committee on Science, Space, and Technology of the House of Representatives a report on the study under paragraph (1) that includes the information and recommendations required under paragraph (1).*
(Emphasis added).

24.     The Report required by 112 PL 141 § 100231(c) entitled "FLOOD INSURANCE-More

Information Needed on Subsidized Properties" was issued by the United States Government

Accounting Office in July 2013. A true and correct copy of this report is attached as Exhibit

C. Exhibit C appears to be the only report mandated by BW-12 which has been completed

to date.  Its observations and conclusions include the following:

a.      "The Biggert-Waters Act will likely require several years for FEMA to fully

implement. *FEMA officials acknowledged that they have data limitations and*

*other issues to resolve before eliminating some subsidies*....For example, the act

eliminated subsidies for residential policies that covered nonprimary residences.

*FEMA has data on whether a policy covers a primary residence but officials stated*

*that it may be outdated or incorrect.....*" Id., p.16.

b.      The act also eliminated subsidies for business policies. However, FEMA categorizes

policies as residential and nonresidential rather than residential and business. As a

result, *FEMA does not have the information to identify nonresidential properties,*

*such as schools or churches that are not businesses and continue to qualify for a*

*subsidy*." Id.

c.      "Beginning in October 2013, FEMA will require applicants to provide residential and

business status for new policies and renewals. Additionally, the act states that

subsidies will be eliminated for policies that have received cumulative payment

amounts for flood-related damage that equaled or exceeded the fair market value of

the property, and for policies that experience damage exceeding 50 percent of the fair

market value of the property after enactment. *Currently, FEMA is unable to make*

*this determination as it does not maintain data on the fair market value of properties insured by subsidized policies. FEMA officials said that they are in the process of identifying a data source.*" Id., p.16.

d.      "*FEMA also does not have information on the flood risk of properties with previously subsidized rates, which is needed to establish full-risk rates for these properties going forward.*." Id., p. 27.

e.      "*FEMA does not have sufficient data to estimate the aggregate cost of subsidies....*" Id.

f.      "*FEMA generally lacks information to establish full-risk rates that reflect flood risk for active policies that no longer qualify for subsidies...and also lacks a plan for proactively obtaining such information.*"

g.      "*FEMA does not have key information used in determining full-risk rates from all policyholders....*" Id.

h.      "Although subsidized policies have been identified as a risk to the program because of the financial drain they represent, *FEMA does not have a plan to expeditiously and proactively obtain the information needed to set full-risk rates for all of them.*" Id., at 32.

i.      Without a plan to expeditiously obtain property-level elevation information, FEMA will continue to lack basic information needed to accurately determine flood risk and will continue to base full-risk rate increases for previously subsidized policies on limited estimates. As a result, *FEMA's phased-in rates for previously subsidized policies still may not reflect a property's full risk of flooding, with some*

*policyholders paying premiums that are below and others paying premiums that exceed full-risk rates*. Id.

j.     "....*eliminating or reducing subsidized policies could have unintended consequences, such as increasing premium rates to the point that flood insurance is no longer affordable for some policyholders and potential declines in program participation*." Id., p. 33.

k.     ....Although accelerating the elimination of subsidies could strengthen the financial solvency of the program, it also entails trade-offs and unintended consequences. For example....*the elimination of subsidies for pre-FIRM properties would on average more than double these policyholders' premium rates, raising concerns about the affordability of the coverage and participation in the program. Higher premium rates might result in reduced participation in NFIP over time as people either decide to drop their policies or are priced out of the market*....Even reducing, rather than eliminating, subsidies could increase the financial burden on some existing policyholders—particularly low-income policyholders—and could lead to some of them deciding to leave the program. As a result, *if owners of pre-FIRM properties, which have relatively high flood losses, cancelled their insurance policies, the federal government—and ultimately taxpayers—could face increased costs in the form of FEMA disaster assistance grants to these individuals*."   Id., p. 34.

l.     "....assistance will be necessary for some policyholders to help them transition to either full-risk rates, or to mitigate their properties, otherwise some property owners might not be able to afford to remain in their homes....According to FEMA officials,

as of May 31, 2013, FEMA has consulted with the National Academy of Sciences *about determining how to undertake this study*." *Id.*, p. 36.

25.    There are even more examples of BW-12 mandated study and reporting requirements which have not been complied with.  For example, 112 PL 141 §100221 provides:

§100221. INTERAGENCY COORDINATION STUDY.

(a) In General.--The Administrator shall enter into a contract with the National Academy of Public Administration to conduct a study on how the Federal Emergency Management Agency--

(1) should improve interagency and intergovernmental coordination on flood mapping, including a funding strategy to leverage and coordinate budgets and expenditures; and

(2) can establish joint funding mechanisms with other Federal agencies and units of State and local government to share the collection and utilization of data among all governmental users.

(b) Timing.--A contract entered into under subsection (a) shall require that, *not later than 180 days after the date of enactment of this subtitle*, the National Academy of Public Administration shall report the findings of the study required under subsection (a) to--

(1) the Committee on Banking, Housing, and Urban Affairs of the Senate;

(2) the Committee on Financial Services of the House of Representatives;

(3) the Committee on Appropriations of the Senate; and

(4) the Committee on Appropriations of the House of Representatives.

(Emphasis added).

Additionally, 112 PL 141 § 100233, reads:

§ 100233. GAO STUDY ON BUSINESS INTERRUPTION AND ADDITIONAL LIVING EXPENSES COVERAGES.

(a) Study.--The Comptroller General of the United States shall conduct a study concerning--

(1) the availability of additional living expenses and business interruption coverage in the private marketplace for flood insurance;

(2) the feasibility of allowing the National Flood Insurance Program to offer such coverage at the option of the consumer;

(3) the estimated cost to consumers if the National Flood Insurance Program priced such optional coverage at true actuarial rates;

(4) the impact such optional coverage would have on consumer participation in the National Flood Insurance Program; and

(5) the fiscal impact such optional coverage would have upon the National Flood Insurance Fund if such optional coverage were included in the National Flood Insurance Program, as described in paragraph (2), at the price described in paragraph (3).

(b) Report.--*Not later than 1 year after the date of enactment of this Act*, the Comptroller General shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report containing the results of the study under subsection (a).  The FEMA Administrator should have the benefit of these impact studies before acting.

Additionally, 112 PL 141 § 100234, reads:

Sec. 100235.  REPORT ON INCLUSION OF BUILDING CODES IN FLOODPLAIN MANAGEMENT CRITERIA.

*Not later than 6 months after the date of enactment of this Act*, the Administrator of the Federal Emergency Management Agency shall conduct a study and submit a report to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives regarding the impact, effectiveness, and feasibility of amending section 1361 of the National Flood Insurance Act of 1968 (42 U.S.C. 4102) to include widely used and nationally recognized building codes as part of the floodplain management criteria developed under such section, and shall determine--

(1) the regulatory, financial, and economic impacts of such a building code requirement on homeowners, States and local communities, local land use policies, and the Federal Emergency Management Agency;

(2) the resources required of State and local communities to administer and enforce such a building code requirement;

(3) the effectiveness of such a building code requirement in reducing flood-related damage to buildings and contents;

(4) the impact of such a building code requirement on the actuarial soundness of the National Flood Insurance Program;

(5) the effectiveness of nationally recognized codes in allowing innovative materials and systems for flood-resistant construction;

(6) the feasibility and effectiveness of providing an incentive in lower premium rates for flood insurance coverage under such Act for structures meeting whichever of such widely used and nationally recognized building codes or any applicable local building codes provides greater protection from flood damage;

(7) the impact of such a building code requirement on rural communities with different building code challenges than urban communities; and

(8) the impact of such a building code requirement on Indian reservations.  The building codes and their impact are a critical aspect of the success of the NFIP, and the FEMA Administrator should have the benefit of the information in this study to make his decisions.

(Emphasis added).

26.     Any attempt by FEMA to proceed with flood insurance rate increases and substantial changes

in coverage under the NFIP without first obtaining these studies mandated 112 PL 141 §

100236, 112 PL 141 § 100231, 112 PL 141 § 100233, and 112 PL 141 § 100234 and

thereafter analyzing the results is "arbitrary and capricious", i.e. they are proceeding without

consideration of much of the relevant necessary evidence which Congress has expressly

identified and directed FEMA and Comptroller of the Currency and others to furnish to

Congress sufficiently in advance of October 1, 2013 to make necessary changes and

corrections in 112 PL 141.  There is a clear mandate on FEMA in NFIP to ensure that rates

are "reasonable" such that it will "encourage prospective insureds to purchase the insurance,"

which is plainly disregarded by proceeding without such studies and information.

27.     State insurance regulators, including but not limited to, the Plaintiff, members of Congress and citizens in states from communities along the Gulf Coast, joined by officials and NFIP customers from Florida to Vermont share the views of Louisiana's Senators,  are voicing deep concern about the affordability issue. They fear rate increases of up to 3,000 percent as mandated by the law will force people to give up their homes.

28.     Another particularly devastating problem for the Mississippi homeowners is that, following Katrina, many rebuilt their homes to the proper flood elevations (and many built over that level) based on FEMA's Advisory Base Flood Elevation Rate Maps available to them at that time.  Unfortunately, FEMA's subsequent remapping of the area resulted in significant increases to the Base Flood Elevation (BFE) level, such that homes thought to have been built well over the BFE are now several feet below that level.  Drastic rate increases reflecting the BFE changes are beginning to be seen now.  These are people that did nothing wrong; they simply built to the standards that were available to them.  Now their rates are going up based on changes to the standard, and FEMA has not properly compiled the studies necessary to properly assess the economic impact and affordability of what they are setting as "full-risk rates".

V.

## COUNT I CLAIM UNDER THE DECLARATORY JUDGMENT ACT

29.     Section 2201 of Title 28 of the United States Code provides that:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516a(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the

Page 23 of 36

United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

30.    The Department seeks a declaration of the rights and other legal relations between FEMA and the citizens of the State of Mississippi which it represents with respect to the issues presented relating to the NFIP fee increase and other issues relating to BW-12. At a minimum, Plaintiff seeks a declaration that

a.    FEMA does not yet have the information that is required in order to make rating decisions and will not have such information until the mandated studies (including those addressing the key issue of "affordability") are obtained and meaningfully reviewed by FEMA, and

b.    That the draconian and unaffordable rates being pushed out beginning October 1, 2013, are not on "reasonable terms" and therefore, contrary to the Congressionally stated intent behind the NFIP, and

c.    That BW-12 specifically required that many of the mandated studies be performed within a specific timeline which would have made the results of the studies available in rate determinations which have instead been made by FEMA in the absence of any such studies, and

d.    Since FEMA failed to meet the mandated timelines, the results of the studies are not, and have not been available for FEMA's consideration in its present rate determinations.

e.    FEMA should not be allowed to move forward with respect to matters scheduled by

Page 24 of 36

BW-12 to take place on and after October 1, 2013, without having first complied with previous BW-12 mandatory deadlines which FEMA has not complied with.

31.    A substantial controversy exists between the Parties who have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment defining the rights and obligations of the parties and in anticipation of future conduct as described in this Complaint.

32.    A declaratory judgment will settle the controversy, serve a useful purpose in clarifying the legal relations at issue, is not being used for the purpose of any sort of procedure or fencing, does not involve any sort of friction between federal or state courts and will not improperly encroach upon state jurisdiction and there is no alternative remedy which is better or more effective under the circumstances.

## VI.

## COUNT II - CLAIM FOR INJUNCTIVE RELIEF UNDER THE APA

33.    Plaintiff incorporates by reference allegations set forth in all preceding paragraphs above as if fully set forth herein in support of Count II of this Complaint.

34.    The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 7021, et seq. "[A]gency action" is defined in § 551(13) to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act*." (Emphasis added.) The APA provides relief for a failure to act in § 706(1): "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."

35.   Sections 702, 704, and 706(1) all insist upon an "agency action," either as the action complained of (in §§ 702 and 704) or as the action to be compelled (in § 706(1)). The definition of that term begins with a list of five categories of decisions made or outcomes implemented by an agency–"agency rule, order, license, sanction [or] relief." § 551(13). All of those categories involve circumscribed, discrete agency actions, as their definitions make clear: "an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy" (rule); "a final disposition . . . in a matter other than rule making" (order); a "permit . . . or other form of permission" (license); a "prohibition . . . or taking [of] other compulsory or restrictive action" (sanction); or a "grant of money, assistance, license, authority," etc., or "recognition of a claim, right, immunity," etc., or "taking of other action on the application or petition of, and beneficial to, a person" (relief). §§ 551(4), (6), (8), (10), (11).

36.   The terms following those five categories of agency action are not defined in the APA: "or the equivalent or denial thereof, or failure to act." § 551(13). The final term in the definition, "failure to act," is properly understood as a failure to take an agency action--that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13). A "failure to act" is not the same thing as a "denial." The latter is the agency's act of saying no to a request; the former is simply the omission of an action without formally rejecting a request--for example, the failure to promulgate a rule or make some decision by a statutory deadline. The important point is that a "failure to act" is properly understood to be limited, as are the other items in § 551(13), to a discrete action. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63, 124 S. Ct. 2373, 159 L. Ed. 2d 137 (U.S. 2004).

37.     A second point central to the analysis of the present case is that the only agency action that can be compelled under the APA is action legally required. This limitation appears in § 706(1)'s authorization for courts to "compel agency action unlawfully withheld." In this regard the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs--principally writs of mandamus under the All Writs Act, now codified at 28 U.S.C. § 1651(a). *Norton,* 542 U.S. at 63. Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take. *Id.,* at 64.

38.     The limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law). Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be. For example, in *Norton,* the Supreme Court cited by way of example 47 U.S.C. § 251(d)(1), which required the Federal Communications Commission "to establish regulations to implement" interconnection requirements "[w]ithin 6 months" of the date of enactment of the Telecommunications Act of 1996, and noted that this "would have supported a judicial decree under the APA requiring the prompt issuance of regulations, but not a judicial decree setting forth the content of those regulations." *Id.,* at 65.

39.     FEMA was similarly obligated to obtain and present to Congress within 9 months after passage of BW-12, the "affordability" report mandated by 112 PL 141 § 100236, which is just like the obligation imposed upon the FCC under 47 U.S.C. § 251(d)(1).  FEMA was

further obligated to deliver that report in April of 2013, so that Congress would have an opportunity to study that report for at least 6 months before the rate increases took effect beginning on and after October 1, 2013. Additionally, FEMA was unambiguously mandated to enter into other contracts and obtain other studies and information from various third parties not later than the first anniversary of the passage of BW-12, which FEMA likewise failed to comply with.

40. Federal Courts are familiar with and regularly entertain challenges to Federal Agencies which take action without first receiving the results of required studies. Though deferential, judicial review under the APA is designed to "ensure that the agency considered all of the relevant factors and that its decision contained no clear error of judgment." *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987) (internal citation and quotation omitted). "The deference accorded an agency's scientific or technical expertise is not unlimited." *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001). An agency's decision is arbitrary and capricious if it has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971) (reviewing court may overturn an agency's action as arbitrary and capricious if the agency failed to consider relevant factors, failed to base its decision on those factors, and/or made a "clear error of judgment"), overruled on other grounds by *Califano*

*v. Sanders*, 430 U.S. 99, 105, 97 S. Ct. 980, 51 L. Ed. 2d 192 (1977)).

41.     FEMA's failure to timely comply with 112 PL 141 § 100236's mandate and the other mandatory obligations imposed during the first year after the passage of BW-12 are multiple discrete agency inactions or failures to act which mandate a judicial decree under the APA requiring FEMA to deliver the required reports to Congress and enter into the various contracts and consulting relationships with third parties all before any rate increases are implemented.

42.     This Court should enjoin the October 1, 2013 NFIP rate increases until such time as FEMA complied with each and every one of the mandatory obligations and deadlines in BW-12 preceding those mandated to occur on or after  October 1, 2013.

VII.

**COUNT III REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF**

43.     Plaintiff incorporates by reference allegations set forth in all preceding paragraphs above as if fully set forth herein in support of Count III of this Complaint.

44.     A preliminary injunction is an extraordinary remedy that should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest.

45.     Plaintiff has a substantial likelihood of prevailing on the merits because:

  a.      112 PL 141 §100236 and the other deadline driven requirements under BW 12 are grants of authority that FEMA has no discretion whether or not to exercise because

the various provisions of the statute are all phrased in mandatory rather than discretionary language. See, *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 220 (5th Cir. Tex. 2010)(finding similar obligation on FEMA to promulgate regulations pursuant to Federal Assistance to Individuals and Households and codified at 42 U.S.C. § 5174(j)[1]). Unlike the situation in *La Union Del Pueblo Entero,* where FEMA had promulgated certain mandatory regulations which the Plaintiff contended did not elaborate with sufficient specificity certain statutory requirements, FEMA, in the present case, completely failed to comply with Congress's instructions or time tables to procure certain studies in advance of the NFIP rate increases. 112 PL 141 § 100236, just like 42 U.S.C. § 5174(j), is phrased in mandatory language rather than permissive or discretionary language. Subparagraph (a) states that "The Administrator *shall* conduct a study...." (Emphasis added). Subparagraph (d) similarly states that: "[t]o inform the [FEMA] Administrator in the conduct of the study under subsection (a), the Administrator *shall* enter into a contract under which the National Academy of Sciences, in consultation with the Comptroller General of the United States, *shall conduct and submit to the Administrator* an economic analysis of the costs and benefits to the Federal Government of a flood insurance program with full risk-based premiums, combined with means-tested Federal assistance to aid individuals who cannot afford coverage, through an insurance voucher program. The analysis *shall* compare the

---

[1] That code section reads: "The President *shall* prescribe rules and regulations to carry out this section, including criteria, standards, and procedures for determining eligibility for assistance." 42 USCS § 5174 (emphasis added).

Page 30 of 36

costs of a program of risk-based rates and means-tested assistance to the current system of subsidized flood insurance rates and federally funded disaster relief for people without coverage." Subsection (c) further mandates that "[n]ot later than 270 days after the date of enactment of this Act, the Administrator *shall* submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report that contains the results of the study and analysis under this section." (Emphasis added).  Because this Court cannot presume that 112 PL 141 §100236's repeated use of the word "shall" when imposing obligations on the part of the FEMA administrator to act within specified deadlines after the enactment of the Act is meaningless, this section necessarily imposes an obligation on FEMA to; (a) conduct a study, (b) by contracting with the National Academy of Sciences, in consultation with the Comptroller General of the United States, (c) to produce an economic analysis of the costs and benefits to the Federal Government of a flood insurance program *with full risk-based premiums, combined with means-tested Federal assistance to aid individuals who cannot afford coverage, through an insurance voucher program* and *comparing the costs of a program of risk-based rates and means-tested assistance to the current system of subsidized flood insurance rates and federally funded disaster relief for people without coverage* (d) and "[n]ot later than 270 days after the date of enactment of this Act, to submit a report that contains the results of the study and analysis under this section to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of

Representatives...."  The other provisions of BW-12 cited and discussed previously

all contain "shall" as mandatory language which FEMA has not complied with.

46.    A substantial threat of irreparable injury exists if the injunction is not granted in the form of

the eminent drastic increases in NFIP insurance premiums which will otherwise go into

effect from and after October 1, 2013 because:

a.    Mississippi and Louisiana appear to be the only states in which FEMA has completed

updated Flood Insurance Rate Mapping, so Mississippi citizens will have

substantially higher premiums than those charged in other states which have yet to

initiate or complete the process of updating Flood Insurance Rate Mapping. As a

result, the citizens of Mississippi with flood insurance will be among the first NFIP

insureds to bear the brunt of FEMA anticipated drastic rate increases.

b.    The Flood Disaster Protection Act of 1973 requires that individuals, businesses, and

others buying, building, or improving property located or to be located in identified

areas of special flood hazards within NFIP participating communities are required to

purchase flood insurance as a prerequisite for receiving any type of direct or indirect

Federal financial assistance (e.g., any loan, grant, guaranty, insurance, payment,

subsidy, or disaster assistance) when the building or personal property is the subject

of or security for such assistance.  If flood insurance becomes unaffordable as the

result of FEMA's failure to comply with NFIP's "affordability" mandate, which has

not been repealed or changed by BW 12, Mississippi will increasingly become

ineligible for direct or indirect Federal financial assistance (e.g., any loan, grant,

guaranty, insurance, payment, subsidy, or disaster assistance) when the building or

Page 32 of 36

personal property is the subject of or security for such assistance.

c.   The NFIP was simultaneously amended to prohibit federally regulated lending institutions from making any real estate loans in a special flood hazard area unless the property was covered by flood insurance. 42 U.S.C. § 4012a(b).  Lenders were authorized to charge borrowers a "reasonable fee" to cover the initial determination whether a home is in a special flood hazard area, and subsequent "life-of-loan monitoring." 12 C.F.R. § 339.8(a). When property is in such an area, the lender must notify the borrower of the requirement to have flood insurance. 42 U.S.C. § 4012a(e)(1).  If the borrower fails to buy such insurance within forty-five days of being notified, the lender is required to buy it for the borrower and charge the costs back to the borrower. Id. § 4012a(e)(2). This practice is commonly known as "forced placement" of flood insurance.  A lender may not simply ignore this requirement because a lender that has a "pattern or practice" of violating the requirements of this section shall be assessed civil penalties "by the appropriate Federal entity." Id. § 4012a(f)(1)--(2); see also id. § 4104a(1) (providing that "[e]ach Federal entity for lending regulation . . . shall by regulation require regulated lending institutions" to give advance notice of the flood insurance requirement before closing on the  loan); 12 C.F.R. § 339.3 (prohibiting federally insured state banks from making loans in special flood hazard areas unless the property is covered by flood insurance).  Among other things, BW-12 eliminated the $100,000 cap on the total amount of penalties which could be assessed against any single regulated lending institution during any calendar year, so that the penalty amount which may be assessed against any single

lender is now unlimited.  These laws mandate that all federally insured lenders in Mississippi must obtain NFIP flood insurance coverage even if the owner of a mortgaged structure is unwilling or unable to afford such coverage, or otherwise the lenders face unlimited penalties since the enactment of BW 12.

d.    Finally, numerous residents of Mississippi applied for and received FEMA grants and other benefits in good faith following Hurricane Katrina conditioned in part upon their continued participation in NFIP.  At the time that they did so, the NFIP rates were reasonable and were anticipated to remain so based on the stated purposes of the NFIP.  If the cost of maintaining flood insurance rapidly escalates beyond the affordability of most Mississippi residents based on the requirements of BW-12, the recipients of such grants and other benefits may be subjected to adverse action by FEMA of which they have no practical control.

e.    Certain Mississippi citizens are currently incorrectly required to obtain and maintain flood insurance as the result of outdated and erroneous flood maps promulgated by FEMA.  The cost of doing so or pursuing individual remedies attempting to prove that their property is not properly subject to NFIP requirements is currently a financial burden but will shortly become an intolerable financial burden on such Mississippi citizens if FEMA is allowed to escalate flood insurance premiums as planned under BW -12.

47.    The threatened injury outweighs any harm that will result to the non-movant if the injunction is granted because movant is simply seeking to compel FEMA to become compliant with the timing and mandates of Congress contained in BW-12 and the NFIP.

48.   The injunction will serve the public interest because it seeks to require FEMA to take the steps which Congress determined and mandated to be in the public interest prior to any increase in NFIP rate increases, which FEMA failed to comply with.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands declaratory and injunctive relief of and from the Defendant, as follows:

1.   A declaratory finding and judgment that FEMA was obligated to obtain and present to Congress within 9 months after passage of BW-12, the "affordability" report mandated by 112 PL 141 § 100236 by no later than April of 2013, so that Congress would have an opportunity to study that report for 6 months before the rate increases took effect beginning on and after October 1, 2013.

2.   A declaratory finding and judgment that FEMA did not comply with the mandatory reporting requirements and deadlines imposed by 112 PL 141 § 100231 (except §100231(c)), 112 PL 141 § 100233, 112 PL 141 § 100234 and 112 PL 141 § 100236.

3.   A declaratory finding and judgment that FEMA's failure to timely comply with the mandates 112 PL 141 § 100231, 112 PL 141 § 100233, 112 PL 141 § 100234 and 112 PL 141 § 100236 were adiscrete agency inactions or failures to act which mandate a judicial decree under the APA.

4.   Injunctive relief requiring FEMA to deliver the § 100236 report to Congress at least 6 months before any rate increases are implemented;

5.   A declaratory judgment finding that in addition to 42 USC § 4001(a), supra, FEMA was obligated to comply with at least the following other portions of the NFIP which support the same objective: 112 PL 141 § 100231, 112 PL 141 § 100233, and 112 PL 141 § 100234.

6.  Injunctive relief precluding implementation of the the October 1, 2013 NFIP rate increases until such time as FEMA has fully and properly complied with the mandates of 112 PL 141 § 100231, 112 PL 141 § 100233, 112 PL 141 § 100234 and 112 PL 141 § 100236;

7.  Preliminary injunctive relief consistent with the permanent injunctive relief requested above;

8.  Such other relief as may be appropriate under the circumstances.

This the 26TH day of September, 2013

Respectfully submitted,

MISSISSIPPI INSURANCE DEPARTMENT,
by and through MICHAEL J. CHANEY,
COMMISSIONER OF INSURANCE FOR THE
STATE OF MISSISSIPPI

BY:

LEE D. THAMES, JR., ESQ.
(MSB # 10314)
Mississippi Insurance Department
Woolfolk Bldg.
501 North West St., Ste. 1001
P.O. Box 79
Jackson, MS 39205
601-359-3577
lee.thames@mid.ms.gov

Deputy Commissioner & Special Counsel:
Mark Haire, Esq.
(MSB #2065)
Deputy Commissioner of Insurance
Special Counsel to the Commission
501 North West Street, Suite 1001, Woolfolk Bldg.
P.O. Box 79
Jackson, MS 39205-0079
601-359-3573