IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| MISSISSIPPI INSURANCE DEPARTMENT, by and through MICHAEL J. CHANEY, COMMISSIONER OF INSURANCE FOR THE STATE OF MISSISSIPPI,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; RAND BEERS, in his official capacity as the Secretary of the United States Department of Homeland Security; UNITED STATES FEDERAL EMERGENCY MANAGEMENT AGENCY; W. CRAIG FUGATE, in his official capacity as the Administrator of the United States Federal Emergency Management Agency,<br><br>Defendants. | CASE NO. 1:13-CV-379-LG-JMR |

**MEMORANDUM OF AMICUS CURIAE BY THE COMMONWEALTH OF MASSACHUSETTS**

The Mississippi Insurance Department ("MID") brought this action alleging that new flood insurance rates under the Biggert-Waters Flood Insurance Reform and Modernization Act of 2012 ("Biggert Waters") are arbitrary and unlawful. Implementing new rates is part of Congress' charge to the Federal Emergency Management Agency (FEMA). Congress directed the agency to review the current program, make a variety of quantitative and qualitative changes to the rate setting mechanisms, and put new rates into effect. *See* 42 U.S.C. §§ 4014 and 4015. In addition, Congress also charged FEMA with other responsibilities, including the completion

1

of an affordability study[1]—a duty that FEMA has ignored. In its Complaint, MID seeks relief based on FEMA's failure to complete the affordability study on time and has made this failure the centerpiece of its argument for Court intervention. MID First Amended Complaint ("MID Complaint") at 25-31.

FEMA has previously noted publicly its view that missing the study deadline is irrelevant to the issue of rates. *See infra* note 4. However, even if FEMA is correct that the completion of the affordability study is not an absolute condition precedent to the implementation of new rates, FEMA's failure to consider sufficient data generally prior to making new rates may make its decision arbitrary. To the extent that FEMA's decision to implement new rates when it did so was arbitrary, FEMA may not proceed with its plan to charge new rates.

I. The Test for Arbitrariness of FEMA's Actions Must Include a Review of Whether Biggert Waters Allowed FEMA to Wait to Change the Premium Rate Structure and Whether FEMA Should Have Done So

"Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an aspect of the problem. . . ." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To that end, an "agency must examine the relevant data." *Id.* If FEMA acted arbitrarily in its rush to complete new rates,[2] then the Court must enjoin the rate increase.

---

[1] Pub. L. No. 112-141, § 100236. Congress also required additional studies. *See infra* note 3.
[2] President Obama signed Biggert Waters into law on July 6, 2012. In a little over a year, FEMA revamped its premium rate structure and established policies to eliminate subsidies that have existed since the inception of the National Flood Insurance Program in 1968. In order to implement these changes, FEMA has had to gather additional data on every property with a subsidized premium, and much of this work remains to be done. FEMA still must obtain every insured building's elevation and fair market value and determine whether each building is a primary or secondary residence, a business, or other type of structure such as a school. *See* MID Complaint, Exhibit C at 16 and 30-31. At the same time, FEMA was remapping the coastline, *see infra*, and was also supposed to be reviewing data from the statutorily mandated studies.

2

Of course, agencies are not required to do the impossible. If certain information cannot be obtained, and an agency is charged with meeting a deadline, the agency may, at least in some circumstances, act without such information. *Cf. Phila. Citizens in Action v. Schweiker*, 669 F.2d 877, 882–87 (3d Cir. 1982) (permitting the Department of Health and Human Services, acting on a tight deadline, to issue interim rules without notice and comment). If FEMA faced impending deadlines, the law would not hold FEMA to an unreasonable standard. The key is *when* FEMA needed to implement the new rates and whether it made its implementation decision reasonably in light of those deadlines. *See id.*

A. While FEMA Was Supposed to Complete the Studies by Specific Dates, Most of the Rate Implementation Deadlines in Biggert Waters Are Flexible

MID focuses on the study deadlines[3] and the fact that FEMA missed them, but the study deadlines are not the only key deadlines in this case. The crucial deadlines are the statutory dates by which FEMA must put new rates into effect.

The statute provides clear guidance on this point. While it arguably specifies deadlines for new rates for some types of property, *see infra*, for the most part the statute gives FEMA the flexibility to move forward only when it is prepared and ready. *See* 42 U.S.C. § 4015(a).

---

[3] As MID notes, Congress commanded FEMA to undertake certain studies, both for its own use and for Congressional review. MID focuses principally on the affordability study, but as MID notes, the statute requires many more studies, all of which in some way bear on either the determination of rates, scope of coverage, or potential problems in implementation. *See* MID Memorandum in Support of Motion for Stay or, in the Alternative, for Preliminary Injunction ("MID Memorandum") at 16. With the benefit of the studies, FEMA would be able to improve its implementation of Biggert Waters and Congress could better determine whether to amend the program. *See, e.g.,* MID Memorandum, Exhibit 1 at 25-26.
    Many of the study deadlines are hard deadlines. Most pertinent, the affordability study was to be completed no later than 270 days after the date of enactment. Pub. L. No. 112-141, § 100236. This was not the only such deadline, however. Other studies were also to be completed in specific time periods. *See, e.g.,* the Interagency Coordination Study (180 days after enactment, Pub. L. No. 112-141, § 100221(b)); the Study and Report on Graduated Risk (twelve months after enactment, Pub. L. No. 112-141, § 100231(e)(2)); and the Report on Inclusion of Building Codes in Floodplain Management Criteria (six months after enactment, Pub. L. No. 112-141, § 10235).

The principal section setting forth how and when FEMA should set rates is 42 U.S.C. § 4015(a), which provides in part:

> On the basis of estimates made under section 4014 of this title, and such other information as may be necessary, the Administrator shall from time to time prescribe, after providing notice—(1) chargeable premium rates . . . .

(emphasis added). Compared to the study deadlines, this paragraph provides FEMA with much greater leeway in deciding when to set new rates. The statute does not require FEMA to set new rates by a specific date or even to do so promptly, but instead uses discretionary "from time to time" language. *See Defenders of Wildlife v. Browner*, 909 F. Supp. 1342, 1350 (D. Ariz. 1995) (language directing an agency to act "from time to time" is discretionary and not comparable to language directing an agency to act promptly).

It is true that certain subsets of policyholders became subject to unsubsidized rates on specific dates. *See, e.g.,* Pub. L. No. 112-141, § 100205(a)(2) (amendments excluding certain properties from receiving subsidized premiums were to be effective 90 days after the date of enactment, another deadline that FEMA ignored); Pub. L. No. 112-141, § 100205(e) ("Nothing in this section or the amendments made by this section may be construed to affect the requirement under section 2(c) of the Act entitled 'An Act to extend the National Flood Insurance Program, and for other purposes', approved May 31, 2012 (Public Law 112–123), that the first increase in chargeable risk premium rates for residential properties which are not the primary residence of an individual take effect on July 1, 2012."). However, the existence of a hard deadline for the transition to actuarial rates for some policyholders further supports the conclusion that Congress intended to provide FEMA with implementation flexibility as to the *other* affected policyholders. Given this flexibility, FEMA could have, in many instances, waited to gather needed data before setting new rates.

B.  With FEMA's Flexible Rate Implementation Deadline Came Responsibility

FEMA has been opining that it had to move forward.[4]  In fact, FEMA had latitude with respect to when it needed to set rates for most policyholders, and FEMA cannot disavow its responsibility to make an informed decision.  *Compare Schweiker*, *supra*, *with New Jersey v. EPA*, 626 F.2d 1038, 1044-45 (D.C. Cir. 1980) (rejecting the argument that the EPA's "tight schedule" was a good cause exception to the notice-and-comment provision, as such exceptions are narrowly construed to assure that an agency's decision will be informed and responsive).  In determining whether FEMA acted arbitrarily by proceeding, the Court should look at whether FEMA, in implementing rates without the benefit of various studies and data, handled its responsibility in a reasonable manner.  *See Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (an agency's rule will be upheld "so long as it is reasonable and reasonably explained"); *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 619 (5th Cir. 2000) ("arbitrary-and-capricious review focuses on the reasonableness of the agency's decision-making process").

In doing so, the Court will no doubt consider a panoply of factors.  As part of that analysis, it is important that the Court focus on two areas—(1) the avoidable harm necessarily created by FEMA's premature rate decisions; and (2) FEMA's failure to use properly certain readily available tools in making its rate decisions.  These tools are discussed in Parts II and III *infra*.

---

[4] Craig Fugate, FEMA Director, testified before the Committee on Banking, Housing and Urban Affairs that he had found no way to delay implementation of the new rates.  Andrew G. Simpson, *FEMA Chief Disappoints Senators, Says He Can't Delay Flood Insurance Rates*, Ins. J., Sept. 23, 2013, http://www.insurancejournal.com/news/national/2013/09/23/305915.htm.

II.     The New Flood Insurance Rates Are Currently Clouded in Uncertainty, Causing Significant Harm to Consumers

One key factor in analyzing FEMA's reasonableness is a review of the damage necessarily caused by FEMA's actions. To the extent the agency knowingly caused significant harm that was readily avoidable, this bears on whether FEMA was acting reasonably in moving forward at this juncture. *See Wheatland Elec. Coop. v. Polansky*, 265 P.3d 1194, 1203 (Kan. App. 2011) (interpreting a state law allowing a court to set aside an agency action that is unreasonable, arbitrary or capricious, "an action is unreasonable when it is taken without regard to the benefit or harm to all interested parties or is without foundation in fact, and . . . an action is arbitrary and capricious if it is unreasonable or lacks any factual basis").

In the present case, Congress charged FEMA with implementing a new rate and mapping regime based on a variety of new factors. *See, e.g.,* Pub. L. No. 112-141, § 100216(b)(3)(E) (instructing FEMA to use criteria developed by the Technical Mapping Advisory Council); 42 U.S.C. § 4014(a)(2) (limiting the methods by which FEMA may estimate rates); 42 U.S.C. § 4015(b)(5) (rates must be "adequate, on the basis of accepted actuarial principles, to cover the average historical loss year obligations incurred by the National Flood Insurance Fund"). The proper calculation of the new rates depends on an array of quantitative and qualitative factors, whose form and accuracy in turn depend on the very information to be gathered in the Biggert Waters studies. Moving forward without this information necessarily means that FEMA's new rates are provisional, leaving consumers with much uncertainty. What the true rates will later be, and when the true rates will replace the 'placeholders,' is anyone's guess.[5]

---

[5] Of course, if later accurate rates are implemented, there is no assurance that FEMA will offer refunds or retroactive adjustments to consumers. The agency may try to decree that the changes apply only prospectively, leaving consumers with significant and unjustified debt. Moreover, until accurate rates are calculated, consumers likely face

This is necessarily the case, given FEMA's current lack of data. For example, according to the Government Accountability Office, "property elevations relative to the base flood elevation are unknown for 97 percent of both the 1.15 million historically subsidized policies and the more than 700,000 remaining subsidized policies in [Special Flood Hazard Areas]." MID Complaint, Exhibit C at 31. FEMA well knows that, without elevation data,[6] its new rates are tentative and will need to change when FEMA collects more data on a property's actual risk of flooding. *See* FEMA, *NFIP Flood Insurance Manual*, at RATE 23, *available at* http://www.fema.gov/media-library-data/7c1b0352fe3987c36569fccc492ab2ca/change_package_508_oct2013.pdf ("Tentative rates are used to issue policies when agents/producers fail to provide the required full-risk rating information. . . . Tentative rates (ranging from $3 to $12 per $100 of coverage) are generally higher than other rates published in this manual.").[7]

The lack of data and subsequent uncertainty concerning flood insurance rates make it difficult to value properties for sale and could lead to an unstable housing market. Uncertainty always affects real estate prices. *See, e.g.*, Federal Reserve, *The U.S. Housing Market: Current Conditions and Policy Considerations* (Jan. 4, 2012) at 1, *available at* http://www.federalreserve.gov/publications/other-reports/files/housing-white-paper-20120104.pdf ("The

---

an unending series of rate hikes. *See* 42 U.S.C. § 4015(e) (providing that premiums will increase by twenty five percent each year until they reflect the full-risk rate).

[6] At present, FEMA is handling the lack of data by shifting to homeowners the burden of gathering elevation data. According to FEMA, "If you live in a high-risk flood zone, you should provide an Elevation Certificate to your insurance agent to obtain flood insurance and *ensure that your premium accurately reflects your risk*." FEMA, *Fact Sheet: Homeowner's Guide to Elevation Certificates*, *available at* http://www.fema.gov/media-library-data/20130726-1914-25045-8243/floodsmart_factsheet_homeowners.pdf (emphasis added). FEMA then warns that "[d]epending on your location and the complexity of the job, the cost of a surveyor can vary from $500 to $2,000 or more." *Id.*

[7] FEMA also lacks data to categorize structures as required by Biggert Waters. For example, the act eliminates subsidies for policies covering secondary residences, 42 U.S.C. § 4014(a)(2)(A), but FEMA officials have acknowledged that FEMA lacks even this basic knowledge. *See* MID Complaint, Exhibit C at 16 (noting that "[i]n the past, FEMA did not collect this information for policy renewal so it may have changed over time").

extraordinary problems plaguing the housing market reflect in part the effect of weak demand due to high unemployment and heightened uncertainty."); *see also* MID Complaint, Exhibit C at 34 (interviewed stakeholders "noted that increased insurance costs might make some properties more difficult to sell, particularly pre-FIRM properties in older, inland communities at high risk of flooding").

This uncertainty and harm will be present everywhere FEMA is setting new rates. We have already seen it in Massachusetts. Due to its older housing stock, Massachusetts has a high percentage of subsidized properties. *See NFIP Policyholders: Total Number of Subsidized Policies by State and County (as of 12/31/2012)*, http://www.arcgis.com/home/item.html?id=e0208985e8e64d44bca999325254ff5b (showing that forty-two percent of policies in Massachusetts are subsidized as of December 31, 2012). The problem is further exacerbated because FEMA is currently redrawing the maps in several Massachusetts communities. *See, e.g.*, Town of Scituate, *Information on Proposed Changes to FEMA's Firm Maps*, http://www.scituatema.gov/home/news/information-on-proposed-changes-to-fema%E2%80%99s-firm-maps; Town of Marshfield, *Draft Flood Rate Maps*, http://www.townofmarshfield.org/government-departments-planning-draftratemaps.htm. These new maps will draw many more property owners into zones that will necessitate the purchase of flood insurance. *See, e.g.*, Jennette Barnes, *FEMA Widens Flood Zones, More Properties Now Deemed at High Risk*, Bos. Globe, Aug. 15, 2013, *available at* 2013 WLNR 20197966.

As FEMA phases out subsidies and redraws its maps, numerous Massachusetts home and business owners will face substantial flood insurance rate increases. *See, e.g.*, *Condo Insurance in P'town Jumps from $600 to $5,000*, Cape Cod Times, Oct. 9, 2013, *available at* 2013 WLNR 25282289 (reporting that 1,017 of the 3,400 properties in Provincetown, Massachusetts lie in

high-risk flood zones after the maps were recently redrawn, compared to 580 under old maps); Jennifer Fenn Lefferts, *New Rules for Flood Insurance on Horizon, Local Officials Warn of Map, Rate Changes*, Bos. Globe, Oct. 24, 2013, *available at* 2013 WLNR 26691000 (noting that flood insurance rate increases will impact people across the state, in river as well as coastal communities). Sudden jumps in flood insurance costs will increase the risk of a new wave of foreclosures, as struggling homeowners are hit with yet another significant mortgage-related cost. *See* Christopher Herbert, *The Role of Trigger Events in Ending Homeownership Spells: A Literature Review and Suggestions for Further Research* (Abt Associates Inc., Feb. 12, 2004) (prepared for U.S. Department of Housing and Urban Development) at 1-2, *available at* http://www.abtassociates.com/reports/triggers_final_report.pdf (citing "change in housing costs due to increase in property taxes, insurance costs, or interest payments for ARM" as a trigger leading to the loss of a home). These same problems are occurring across the country,[8] and will necessarily also plague consumers in Mississippi.

### III. In Light of the Harm, the Court Should Examine What Tools Were at FEMA's Disposal and How FEMA Used Those Tools

In addition to weighing the known consumer harm when determining reasonability, the Court should also consider how well or ill FEMA used the tools at its disposal in carrying out its mission. Failure to take advantage of tools or information when making decisions is a sign of

---

[8] *See, e.g.*, Helen Cutner, *Flood Insurance Premiums Spike Has Strangled Home Values*, Ins. News Daily, Oct. 29, 2013, http://www.liveinsurancenews.com/flood-insurance-premiums-spike-strangled-home-values/8530283 (stating that "[t]here are homes in all 50 states that receive coverage from the federal flood insurance program"); Toluse Olorunnipa, *Flood Insurance Jumping Sevenfold Depress U.S. Home Values*, Bloomberg, Oct. 24, 2013, http://www.bloomberg.com/news/2013-10-24/flood-insurance-price-increases-prompt-owners-to-plan-home-sales.html (reporting high increases in premiums for homeowners in Florida); *Louisiana Lawmakers Look into Flood Insurance Rate Hikes*, Shreveport Times, Oct. 23. 2013, http://www.shreveporttimes.com/viewart/20131023/NEWS01/131023002/Louisiana-lawmakers-look-into-flood-insurance-rate-hikes (reporting flood insurance premium increases in Louisiana).

unreasonable action. For instance, when an agency ignores a Congressional mandate to conduct studies that are intended to help the agency, this is a factor to consider in reviewing the reasonableness of the agency's behavior. *See generally Brower v. Evans*, 257 F.3d 1058 (9th Cir. 2001) (agency's finding of insufficient evidence was arbitrary when agency failed to complete required studies). In *Brower*, a statute required the Secretary of Commerce to conduct stress studies on dolphins and then determine whether tuna fishing was adversely affecting dolphin stock. The Secretary of Commerce "flouted" the statutory scheme by failing to complete the studies before making decisions required by the statute. *Brower* provides some useful guidance here, where Congress provided a variety of tools to FEMA and yet the agency failed to utilize them properly.

    A. Congress Gave FEMA Many Important Tools to Assist it in Implementing Biggert Waters

In its effort to ensure that FEMA carried out its mission responsibly and appropriately, Congress provided various types of technical and structural assistance for the agency to use in implementing the Biggert Waters rate re-evaluations. The GAO created, as Congress required in Pub. L. No. 112-141, § 100231, the report attached as Exhibit C to MID's Complaint. This report provides substantial guidance to FEMA in improving its processes and acquiring the necessary data so as to better implement the National Flood Insurance Program. Biggert Waters also created the Technical Mapping Advisory Council to provide recommendations to FEMA regarding, *inter alia*, improving flood maps and risk assessments. *See* Pub. L. No. 112-141, § 100215. Once provided, these recommendations are to be used in updating rate maps. *See* Pub. L. No. 112-141, § 100216(b)(3)(E). Further, Congress demanded, on a short timetable, that

10

FEMA complete numerous other studies. *See supra* note 3. Congress' actions underscore a legislative desire that FEMA make use of the best information available. *See Brower*, *supra*. This is particularly important given the significant, irreversible consequences facing policyholders: foreclosures, forced sales, and more.

### B. FEMA Ignored the Opportunity to Use Tools Provided by Congress and Instead Simply Moved Forward and Set Rates

Although Congress put a variety of tools at FEMA's disposal, the agency's use of the tools seems wanting. Since FEMA still has not conducted the mandated affordability study, it appears not to have used that tool at all.[9] Nor does it appear that the other required studies have been completed, with the exception of the GAO's report. MID Complaint at 17-18. Meanwhile, the GAO's report serves to underscore concerns about FEMA's unwillingness to procure accurate data. "FEMA generally lacks information to establish full-risk rates that reflect flood risk for active policies that no longer qualify for subsidies as a result of the Biggert-Waters Act and also lacks a plan for proactively obtaining such information." MID Complaint, Exhibit C at 30. The GAO's findings included:

    a) "FEMA does not have key information used in determining full-risk rates from all policyholders." *Id.*

    b) "FEMA officials said they have been using the assumption that subsidized rates are about half of the full-risk rates and have begun implementing premium increases of at least 100 percent for all active policies that are having their subsidies eliminated." *Id.* at 32.

---

[9] Biggert Waters does not explicitly specify that FEMA had to complete the studies before implementing new rates. Regardless of this, FEMA certainly had the authority under the statute to do so.

    c)     "FEMA will rely on certain policyholders to voluntarily obtain elevation certificates . . . . Without a plan to expeditiously obtain property-level elevation information, FEMA will continue to lack basic information needed to accurately determine flood risk and will continue to base full-risk rate increases for previously subsidized policies on limited estimates. As a result, FEMA's phased-in rates for previously subsidized policies still may not reflect a property's full risk of flooding, with some policyholders paying premiums that are below and others paying premiums that exceed full-risk rates." *Id.*

The GAO's conclusions are especially troubling given that Congress has stressed the importance of not overcharging consumers. FEMA is responsible for "making flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection." 42 U.S.C. § 4001(a). While the National Flood Insurance Program has been losing money on a colossal scale,[10] Congress is nonetheless determined to protect consumers from rate shock and unfair rate hikes.[11] FEMA is responsible for upholding these Congressional goals. However, rather than utilizing the various tools Congress put at the agency's disposal, FEMA has opted to plow forward instead of waiting to make more informed decisions. While some assumptions may be necessary in the implementation of a complex program, the citations referenced above from the GAO's report are chilling. One hundred percent rate increases should not be the result of blind guesses. To the extent they must happen, they should only result from careful deliberation and appropriate procedure.

---

[10] *See, e.g.,* MID Complaint, Exhibit C at 1-2 ("Since 2000, NFIP has experienced several years with catastrophic losses – losses exceeding $1 billion – and has needed to borrow money from the U.S. Treasury . . . to cover claims in some years. . . . As of May 2013, FEMA owed Treasury $24 billion – up from $17.8 billion prior to Superstorm Sandy – and has not repaid any principal on its loans since 2010.").

[11] Congress placed provisions in Biggert Waters that capped annual rate increases, *see, e.g.,* 42 U.S.C. §§ 4015(e)(2) and (h), and demanded that FEMA gather additional information on rates and consumer harm. This included specific instructions to complete timely the affordability study noted *supra*.

IV.     Conclusion

Coastal communities in Mississippi and throughout the nation are facing a serious problem. FEMA's decision to move forward and implement significant rate changes without key data will result in dramatic insurance cost increases, unaffordable homes, and foreclosures.[12] The situation calls for a searching and thorough review of FEMA's actions. It may be inevitable that necessary rate alterations required by Biggert Waters will make some sites unaffordable.[13] But if this occurs, it should be the Congressional decision that causes the consequences, not bureaucratic ostrich-headedness. Given the potentially irreversible consequences of arbitrary action by FEMA, affected homeowners must be given both the appearance and fact of fair treatment. The Court should carefully review FEMA's actions, and the agency's failure to use the tools Congress provided, in determining whether FEMA's decision to move forward on rate increases at this juncture was arbitrary and unreasonable.

---

[12] The Consumer Financial Protection Bureau has already noted the correlation between expensive force-placed insurance and foreclosures and has issued rules to limit force-placed insurance. Richard Cordray, Director, Consumer Fin. Prot. Bureau, *Remarks at Operation HOPE*, Apr. 10, 2012, *available at* http://www.consumerfinance.gov/newsroom/prepared-remarks-by-richard-cordray-at-operation-hope/ ("We have heard horror stories about people whose foreclosures were accelerated by having force-placed insurance imposed on them without notice."). Just as expensive force-placed insurance leads to foreclosures, so too will expensive flood insurance.

[13] It may also be that even these changes will be ameliorated by legislative action. Congress is currently considering a modification of Biggert Waters in order to address concerns of consumer harm and needless rate increases. *See* Homeowner Flood Insurance Affordability Act of 2013, S. 1610, 113th Congress (2013); Homeowner Flood Insurance Affordability Act of 2013, H.R. 3370, 113th Congress (2013). The measures currently have eighteen cosponsors in the Senate and ninety-three cosponsors in the House.

THIS, the 14th day of November, 2013.

        Respectfully submitted,

        COMMONWEALTH OF MASSACHUSETTS
        OFFICE OF THE ATTORNEY GENERAL
        ATTORNEY GENERAL MARTHA COAKLEY


        */s/ James H. Heidelberg*

        James Heidelberg
        Heidelberg, Steinberger, Colmer & Burrow, P.A.
        P.O. Box 1407
        Pascagoula, Mississippi 39568-1407
        (228) 762-8021
        Email: jheidelberg@hscbpa.com
        Mississippi Bar Number: 2212
        Resident Counsel


        Glenn Kaplan,* Massachusetts Bar No. 567308
        Aaron Lamb,* Massachusetts Bar No. 661654
        Assistant Attorneys General
        Office of the Attorney General
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617) 963-2453
        Email: glenn.kaplan@state.ma.us

*Application for *pro hac vice* admission forthcoming.

## CERTIFICATE OF SERVICE

I, James Heidelberg, do hereby certify that on November 14, 2013, I electronically filed the foregoing MEMORANDUM OF AMICUS CURIAE BY THE COMMONWEALTH OF MASSACHUSETTS with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record registered with the ECF system.

This, the 14th day of November, 2013.

> */s/ James H. Heidelberg*_____
> James Heidelberg
> Resident Counsel