## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

**MISSISSIPPI INSURANCE DEPARTMENT,**
**by and through MICHAEL J. CHANEY, COMMISSIONER**
**OF INSURANCE FOR THE STATE OF MISSISSIPPI**                    **PLAINTIFF**

**VS.**                                         **CASE NO. 1:13-cv-379-LG-JMR**

**UNITED STATES DEPARTMENT OF**
**HOMELAND SECURITY; RAND BEERS,**
**in his official capacity as the Secretary of the**
**United States Department of Homeland Security;**
**UNITED STATES FEDERAL EMERGENCY**
**MANAGEMENT AGENCY; W. CRAIG FUGATE,**
**in his official capacity as the Administrator of the**
**United States Federal Emergency Management Agency**          **DEFENDANTS**

### AMICUS BRIEF OF THE LOUISIANA DEPARTMENT OF INSURANCE IN SUPPORT OF PLAINTIFF'S MOTION FOR STAY OR, IN THE ALTERNATIVE, FOR PRELIMINARY INJUNCTION

Now into Court, through undersigned counsel, comes the Louisiana Department of Insurance, by and through James Donelon, Commissioner of Insurance for the State of Louisiana, which files this memorandum as *amicus curiae* in support of the Plaintiff's, the Mississippi Insurance Department's, Motion for Stay, or in the Alternative, for Preliminary Injunction[1] against the United States Department of Homeland Security, Rand Beers, in his official capacity as the Secretary of the United States Department of Homeland Security, United States Federal Emergency Management Agency ("FEMA"), and W. Craig Fugate, in his official capacity as the Administrator of FEMA (collectively, the "Defendants"). The stay, or in the alternative, preliminary injunction, that Plaintiff requests should be granted for the following reasons:

---
[1] Rec. Doc. 9.

{N2710726.3}

## INTRODUCTION

The First Amended Complaint[2] seeks declaratory and injunctive relief from administrative agency action taken pursuant to the National Flood Insurance Program, 42 U.S.C. § 4001, *et seq.*, ("NFIP"), as amended by the Biggert-Waters Flood Insurance Reform and Modernization Act of 2012, H.R. 4348 ("BW-12") (collectively the "Act"). BW-12 adopts significant changes intended to make the NFIP more financially stable, and to ensure that flood insurance rates more accurately reflect the full actuarial risk of flooding. However, nothing in BW-12 eliminates the mandate that insurance premiums be reasonable and affordable.

The combined effects of several provisions of BW-12 have dramatically increased, and/or will dramatically increase, the flood insurance premium rates for NFIP policy holders, particularly those in flood prone areas such as southern Louisiana and Mississippi. First, BW-12 directs that Flood Insurance Rate Maps ("FIRMs") be updated in light of experience from hurricanes and storms such as Katrina and Rita.[3] Because of the substantial storm surges and extensive flooding associated with these storms, the Base Flood Elevations ("BFEs") have been raised in many areas. BFEs serve as the benchmarks for flood insurance rates: structures built at or below BFEs are subject to substantially higher flood insurance premiums than structures that are built above the BFE. Most property owners who built since FIRMs were first implemented built their homes or buildings at or above the BFE that was in effect at that time. As a result of the new FIRMs, many of these formerly compliant properties are now below the new BFE and thus are subject to substantially higher flood insurance rates. When new FIRMs become effective for an area, the premium rates are to be changed to reflect the risks determined by the

---

[2]     Rec. Doc. 4.
[3]     See 112 PL 141, § 100216.

new maps.[4]  Although the flood insurance rates for current owners of buildings built in accordance with the then-existing BFE are temporarily "grandfathered" and subject to being phased out over five years,[5] those grandfathered rates are lost immediately if the property owner allows the policy to lapse or if he sells his property.[6]  In addition, property that is now below the BFE as a result of the new FIRMs mandated by BW-12 has suffered, or will suffer, a dramatic decrease in its property value, because any prospective purchaser will have to take into account that after the sale, the property would be subject to annual flood insurance rates that are many times higher than the existing rates.  Additionally, the new FIRMs have caused some properties to be in a flood zone that never were before and have required the owners to purchase flood insurance for the first time.

The second way in which BW-12 causes a dramatic increase in rates is that it phases out NFIP premium subsidies for homeowners, business owners, and others who have been shielded from higher premiums in the past.[7]  About twenty percent of NFIP policyholders have enjoyed subsidized rates.  In other words, they paid flood insurance rates that were less than rates that would have reflected the full actuarial risk of flooding for the property.  Many of those policyholders who pay subsidized premiums are in Louisiana and Mississippi, particularly in flood prone areas.  On January 1, 2013, FEMA began phasing out subsidized insurance rates on non-primary residences.  As of October 1, 2013, FEMA began the process of increasing insurance rates on hundreds of thousands of additional homeowners and small business owners who had been benefitting from subsidized rates.

---

[4]     42 U.S.C. § 4015(h).
[5]     42 U.S.C. § 4015(h).
[6]     42 U.S.C. § 4014(g)
[7]     42 U.S.C. § 4015(e)(2).

{N2710726.3}

3

The third way in which BW-12 increases rates is through the establishment of a reserve fund which will be funded by an additional increase in premiums.[8]  All NFIP policyholders will be required to contribute to this reserve fund until it is fully funded.

As a result of these changes, many property owners have seen, or will see, their flood insurance premiums increase dramatically, sometimes more than 3000% of their prior rates.  The rate increases are far greater than what was anticipated when Congress considered BW-12.  Congress was told that the maximum expected increase was about two and one half times current rates.  If the property owners are unable or unwilling to purchase flood insurance at these new higher rates, the lenders are legally obligated to obtain "force placed" policies for them.  If the property owners are unable to pay the new insurance rates, their property will be subject to foreclosure.

Approximately 17.4 million households live in Special Flood Hazard Areas (SFHA) where flood insurance is mandatory and where rates have often been subsidized.  According to the Department of Housing and Urban Development ("HUD"), 41 percent of those households are low-to-median income and could face major difficulties affording rate increases.

Congress recognized that BW-12 could have some adverse impacts on policyholders.  As a result, BW-12 requires that FEMA and other federal agencies undertake a number of studies and reports. Most significantly, 112 PL 141, § 100236 requires that Defendants to undertake and provide Congress with a study to examine affordability issues related to the changes brought about by BW-12.  Despite a deadline that has already passed, this study still has not been completed and may not be completed for several years. Deadlines for other studies mandated by

---

[8]     112 PL 141, § 100212; 42 U.S.C. § 4017(a). .

BW-12 have also expired without completed studies. Without the crucial information that would be derived from these studies, the Defendants lack the necessary information to set new insurance premium rates in a manner that complies with the NFIP's mandate to make "flood insurance coverage available on reasonable terms and conditions."   To set rates without this information and further guidance from Congress would be arbitrary and capricious. Moreover, the implementation of new rates will, in many circumstances, result in taking of the property without justification in violation of the "Takings Clause" of the Fifth Amendment of the United States Constitution.

Plaintiff seeks to have any new flood insurance rates stayed or preliminarily enjoined until the Court conducts a full review and the mandated BW-12 studies have been completed. A federal court is authorized to "compel agency action unlawfully withheld or unreasonably delayed."[9]   Defendants' failure to obtain various studies mandated by BW-12 amounts to an "agency action unlawfully withheld or unreasonably delayed," which is subject to review and remedial action under the federal The Administrative Procedure Act, 5 U.S.C. §§ 501, et seq. (the "APA"). The requested stay or preliminary injunction will merely preserve the status quo while this process takes place.

## INTEREST OF AMICUS CURIAE

Amicus, the Louisiana Department of Insurance, regulates and issues licenses for insurance agents and agencies that sell flood insurance within Louisiana, including both policies procured through the NFIP, as well as excess or surplus flood insurance policies sold through private companies.[10] The Louisiana Department of Insurance is an agency of the State of Louisiana created

---

[9]     5 U.S.C. § 706(1).
[10]     La. R.S. 22:47.

{N2710726.3}

by the Louisiana Constitution.[11]   Under Louisiana law, the Commissioner of Insurance shall "represent the public interest in the administration of this Chapter and shall be responsible to the legislature and the public thereof."[12]   James Donelon is the duly elected Commissioner of Insurance for the State of Louisiana, and is the chief administrative officer of the Louisiana Department of Insurance.   The Act requires that the Administrator of FEMA consult with "appropriate representatives of the insurance authorities of the respective States" about, among other things, "appropriate minimum premiums" and "any other terms and conditions relating to insurance coverage or exclusion which may be necessary to carry out the purposes of this chapter."[13] Commissioner Donelon is the representative "of the insurance authorities" of the State of Louisiana with whom the Administrator is required to consult about premiums and other topics.

The Louisiana Department of Insurance, through Commissioner Donelon, files this brief to protect the interests of the Louisiana NFIP policyholders and other citizens of Louisiana who are adversely affected by the rate increases that Defendants intend to implement, or have implemented, pursuant to BW-12.  Many of the earliest, updated FIRMS that have resulted in changed BFEs relate to Louisiana.[14]  Thousands of Louisiana policyholders who have previously paid subsidized rates will see these subsidies eliminated as a result of BW-12.

Several Louisiana specific examples will demonstrate the impact on Louisiana NFIP policyholders and property owners:

- One individual owns a primary residence worth approximately $350,000 in Belle Chasse, Louisiana.  He built his home in 1998, two feet above the required BFE. Under the

---

[11]   La. Const. Art. IV §§ 1, 11; *see also* La R.S. 36:681, et seq.
[12]   La. R.S. 36:682.
[13]   42 U.S.C. § 4013.
[14]   *See* Exhibit B to the First Amended Complaint (Rec. Doc. 4) (FEMA Map Showing Progress of Flood Mapping in Coastal Counties of the United States).

preliminary new flood maps in Plaquemines Parish, his rate will jump from $633 per year to $17,723, even though his home has never flooded.

- Another individual owns a primary residence purchased in January 2013 worth $359,000 in Belle Chasse, Louisiana. Although his property complied with the BFE at the time of construction, his flood insurance premium will rise from $400 per year to over $9,500.

- A Louisiana financial institution reports that an applicant for a primary residential home financing in Terrebonne Parish, Louisiana, obtained a flood quote on August 20, 2013, for $1,372, but when the loan went to closing on October 24, 2013, because of BW-12, a new quote indicated that he would be charged a premium of $8,340 for the same coverage. The customer's debt to income became unacceptable, and the customer no longer wanted to complete the purchase, so the sale fell through.

## STATUTORY HISTORY

Congress enacted the National Flood Insurance Act in 1968 "in response to a growing concern that the private insurance industry was unable to offer reasonably priced flood insurance on a national basis."[15] The NFIP is a federally-subsidized program designed to make affordable flood insurance available to the general public in flood prone areas. The over-arching purpose of NFIP is to provide *affordable* flood insurance in high-risk areas. The first provision of the Act provides in part that one of the purposes of the NFIP is "making flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection."[16] A related purpose of the NFIP is to "provide flexibility in the program so that such flood insurance may be based on workable methods of pooling risks, minimizing costs, and distributing burdens equitably among those who will be protected by flood insurance and the general public."[17] Congress also found that "it is in the public interest for persons already living in flood-prone areas to have both an opportunity to purchase flood insurance and access to more adequate limits

---

[15] *Flick v. Liberty Mutual Fire Ins. Co.,* 205 F.3d 386, 387 (9th Cir. 2000).
[16] 42 U.S.C. § 4001(a)(4).
[17] 42 U.S.C. § 4001(d)(2).

{N2710726.3}

of coverage, so that they will be indemnified, for their losses in the event of future flood disasters."[18]   BW-12 did not alter these stated purposes.   Rather, the only reference to "affordability" in BW-12 appears in 112 PL 141 § 100236, which mandates the "affordability study," which has not yet been completed.

Pursuant to 42 U.S.C. § 4011(a), "the Administrator of the Federal Emergency Management Agency is authorized to establish and carry out a national flood insurance program which will enable interested persons to purchase insurance against loss resulting from physical damage to or loss of real property or personal property related thereto arising from any flood occurring in the United States." The Act does not set flood insurance premiums; rather, the Act delegates the responsibility for setting flood insurance premium rates to the Administrator of FEMA. The Administrator is "authorized to undertake and carry out such studies and investigations and receive or exchange such information as may be necessary to estimate, and shall from time to time estimate"[19] two categories of rates.  The first category is "risk premium rates for flood insurance which" are "based on consideration of the risk involved and accepted actuarial principles."[20] The second category of estimates is "rates, if less than the rates estimated under paragraph (1) [risk premium rates], which would be reasonable, would encourage prospective insureds to purchase flood insurance, and would be consistent with the purposes of this chapter."[21]

---

[18]    42 U.S.C. § 4002 (a)(6).
[19]    42 U.S.C. § 4014(a).
[20]    42 U.S.C. § 4014(a)(1).
[21]    42 U.S.C. § 4014(a)(2).  However, the Administrator is prohibited from setting rates in this second category for certain categories of property including:  (A) any residential property which is not the primary residence of an individual; (B) any severe repetitive loss property; (C) any property that has incurred flood-related damage in which the cumulative

{N2710726.3}

After making these estimates, "the Administrator shall from time to time prescribe, after providing notice - (1) chargeable premium rates for any types and classes of properties for which insurance coverage shall be available under section 4012 of this title (*at less than the estimated risk premium rates under section 4014(a)(1) of this title, where necessary*)."[22] In setting rates, the Administrator is required to use not only the rate estimates, but also "such other information as may be necessary,"[23] which would include the information obtained from the required affordability study.  One of the considerations that the Administrator is obligated to take into account in setting rates is to ensure that the rates are "adequate, on the basis of accepted actuarial principles, to provide reserves for anticipated losses, *or, if less than such amount, consistent with the objective of making flood insurance available where necessary at reasonable rates so as to encourage prospective insureds to purchase such insurance* and with the purposes of this chapter."[24]

Pursuant to this statutory authority, FEMA adopted the following regulation set forth at 44 C.F.R. 61.7:

---

amounts of payments under this chapter equaled or exceeded the fair market value of such property; (D) any business property; or (E) any property which on or after July 6, 2012, has experienced or sustained- (i) substantial damage exceeding 50 percent of the fair market value of such property; or (ii) substantial improvement exceeding 30 percent of the fair market value of such property.

[22]      42 U.S.C. § 4015(a) (emphasis added).  However, the Administrator cannot set rates below the actuarial risk premium for properties that were constructed or underwent substantial improvement after December 31, 1974, or which were on certain waterfront property leased from the federal government. 42 U.S.C. § 4015(c).  The limitation on setting rates below actuarial risk premiums in this provision appears to be inconsistent with the limitations in 42 U.S.C. § 4014(a)(2) about *estimating* risk premium rates.

[23]      42 U.S.C. § 4015(a) .

[24]      42 U.S.C. § 4015(b)(2) (emphasis added).

{N2710726.3}

(a)Pursuant to section 1307 of the Act, the Federal Insurance Administrator is authorized to undertake studies and investigations to enable him/her to estimate the risk premium rates necessary to provide flood insurance in accordance with accepted actuarial principles, including applicable operating costs and allowances. Such rates are also referred to in this subchapter as "actuarial rates."

(b) The Federal Insurance Administrator is also authorized to prescribe by regulation the rates which can reasonably be charged to insureds in order to encourage them to purchase the flood insurance made available under the Program. Such rates are referred to in this subchapter as "chargeable rates." For areas having special flood, mudslide (i.e., mudflow), and flood-related erosion hazards, chargeable rates are usually lower than actuarial rates.

This provision in the federal regulations, which was not amended after BW-12, recognizes that (i) estimated actuarial rates are often different than chargeable rates and (ii) in areas having special flood risks "chargeable rates are usually lower than actuarial rates."[25]

42 U.S.C. § 4051 authorizes the Administrator to work with the insurance industry to establish a flood insurance pool. The Act provides that "[t]he Administrator, on such terms and conditions as he may from time to time prescribe, shall make periodic payments to the pool formed or otherwise created under section 4051 of this title, *in recognition of such reductions in chargeable premium rates under section 4015 of this title below estimated premium rates* under section 4014(a)(1) of this title *as are required in order to make flood insurance available on reasonable terms and conditions*."[26] The foregoing provisions demonstrate that the Administrator is authorized to set rates below the levels dictated on an actuarial basis if such

---

[25]    The current chargeable rates are set forth in 44 C.F.R. 61.9 and have not been updated since the effective date of BW-12.

[26]    42 U.S.C. § 4054 (emphasis added).

lower rates are necessary to make flood insurance available on reasonable and affordable terms.[27]

In 2012, Congress passed BW-12 to make the NFIP more fiscally sound. According to the United States Government Accountability Service ("GAO"), BW-12 will completely eliminate premium subsidies for about 438,000 businesses, secondary home and repeated loss home policies around the country as of October 1, 2013.[28]   Another 715,000 policies will be affected in 2014 when the subsidies are phased out for primary residential homes, and this phase out happens immediately if the policy lapses or if the home is sold.[29]   These numbers could potentially be higher as the flood plains are expanded and BFEs are changed in the new maps required by BW-12.  FEMA's Administrator acknowledged in his September 18, 2013 testimony before the Senate Committee on Banking, Housing, and Urban Affairs, that many premiums will increase drastically as a result of BW-12 .[30]

BW-12, particularly 112 PL 141, § 100236, expressly mandates that FEMA deliver the affordability study to Congress no later than April of 2013.  In his September 18, 2013 written testimony, Administrator Fugate admitted that the National Academy of Sciences "estimates that it will likely take at least two years to complete the study due to the need to obtain data on

---

[27]     This is subject to the limitation in 42 U.S.C. § 4015(c) discussed in footnote 22.

[28]     *See* GAO, *Flood Insurance: More Information Needed on Subsidized Properties*, REPORT TO CONGRESSIONAL COMMITTEES (July 2013), attached as Exhibit "C" to First Amended Complaint.

[29]     *See* GAO, *National Flood Insurance Program, Continued Attention Needed to Address Challenges*, TESTIMONY BEFORE THE S. COMM. ON BANKING, HOUSING, AND URBAN AFFAIRS, 113th Cong. (2013), p. 6, attached as Exhibit "2" to Plaintiff's Motion.

[30]     *See* Department of Homeland Security, *Implementation of the Biggert-Waters Flood Insurance Reform Act of 2012: One Year After Enactment*, WRITTEN TESTIMONY OF FEMA ADMINISTRATOR CRAIG FUGATE FOR SENATE COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS, SUBCOMMITTEE ON ECONOMIC POLICY, 113th Cong. (Sept. 18, 2013), attached as Exhibit "A" to First Amended Complaint.

{N2710726.3}

policy-holders and their incomes." [31]   There are many other studies and reports required by BW-12, as detailed in the Plaintiff's First Amended Complaint.[32]    As BW-12 makes clear, these studies were to be completed and delivered to Congress so that Congress could see in advance what the impact would be <u>prior</u> to the rate changes that were to take effect on October 1, 2013.

The <u>only</u> report mandated by BW-12 which has been completed to date is the report required by 112 PL 141 § 100231(c), entitled *Flood Insurance: More Information Needed on Subsidized Properties*, REPORT TO CONGRESSIONAL COMMITTEES (July 2013).[33]    This report's findings and conclusions highlight FEMA's lack of necessary data:

1.   "The Biggert-Waters Act will likely require several years for FEMA to fully implement. *FEMA officials acknowledged that they have data limitations and other issues to resolve before eliminating some subsidies.*" *Id.*, at p. 16. (emphasis added).

2.   "Beginning in October 2013, FEMA will require applicants to provide residential and business status for new policies and renewals. Additionally, the act states that subsidies will be eliminated for policies that have received cumulative payment amounts for flood-related damage that equaled or exceeded the fair market value of the property, and for policies that experience damage exceeding 50 percent of the fair market value of the property after enactment. *Currently, FEMA is unable to make this determination as it does not maintain data on the fair market value of properties insured by subsidized policies.* FEMA officials said that they are in the process of identifying a data source." *Id.* at 16. (emphasis added).

3.   "FEMA also does not have information on the flood risk of properties with previously subsidized rates, which is needed to establish full-risk rates for these properties going forward . . ." *Id.* at 27.

---

[31]     *See* Written Testimony Of FEMA Administrator Craig Fugate For Senate Committee On Banking, Housing, And Urban Affairs, Subcommittee On Economic Policy, 113th Cong. (Sept. 18, 2013), attached as Exhibit "A" to First Amended Complaint (emphasis added).

[32]   *See* First Amended Complaint (Rec. Doc. 4),  ¶¶ 23, 25.

[33]   *See* Exhibit "C" to First Amended Complaint.

4.    "FEMA does not have sufficient data to estimate the aggregate cost of subsidies . . ." *Id.*

5.    "FEMA generally lacks information to establish full-risk rates that reflect flood risk for active policies that no longer qualify for subsidies . . . and also lacks a plan for proactively obtaining such information." *Id.*

6.    "FEMA does not have key information used in determining full-risk rates from all policyholders . . ." *Id.*

7.    "Although subsidized policies have been identified as a risk to the program because of the financial drain they represent, FEMA does not have a plan to expeditiously and proactively obtain the information needed to set full-risk rates for all of them." *Id.*, p. 32.

8.    FEMA's phased-in rates for previously subsidized policies still may not reflect a property's full risk of flooding, with some policyholders paying premiums that are below and others paying premiums that exceed full-risk rates. *Id.*

9.    "[E]liminating or reducing subsidized policies could have unintended consequences, such as increasing premium rates to the point that flood insurance is no longer affordable for some policyholders and potential declines in program participation." *Id.*, p. 33.

10.   "[I]f owners of pre-FIRM properties, which have relatively high flood losses, cancelled their insurance policies, the federal government — and ultimately taxpayers — could face increased costs in the form of FEMA disaster assistance grants to these individuals." *Id.*, p. 34.

11.   "[A]ssistance will be necessary for some policyholders to help them transition to either full-risk rates, or to mitigate their properties, otherwise some property owners might not be able to afford to remain in their homes." *Id.*, p. 36.

12.   "According to FEMA officials, as of May 31, 2013, FEMA has consulted with the National Academy of Sciences about determining how to undertake this study." *Id.*, p. 36.

Any attempt by the Defendants to proceed with flood insurance rate increases without first obtaining these studies and thereafter allowing Congress time to evaluate the results would be arbitrary and capricious. Without such studies and information, the Defendants would be

{N2710726.3}

violating the Congressional mandate in the NFIP to ensure that rates are "reasonable" such that it will "encourage prospective insureds to purchase the insurance." For setting rates, the Act obligates the Administrator to use "such other information as may be necessary" in addition to actuarial estimates. The Administrator cannot fulfill this obligation without the information that would be developed by the mandated studies.

## ARGUMENT

The APA authorizes suit against a federal agency by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."[34]   Plaintiff, and the citizens of Mississippi whose interests Plaintiff advances, are "adversely affected or aggrieved by agency action," as are the Louisiana Department of Insurance and the citizens of Louisiana.

The APA permits a federal court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."[35] Therefore, unless and until an agency complies with a statutory directive, a stay or injunctive relief is the appropriate remedy.[36]

The standard for a stay under the APA mirrors the standard for preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.[37]   In the Fifth Circuit, in order to

---

[34]   5 U.S.C. § 702.
[35]    5 U.S.C. § 705.
[36]    *See Florida Key Deer v. Paulison*, 522 F.3d 1133, 1147; *see also McWaters v. Fed. Emergency Mgmt. Agency*, 408 F. Supp. 2d 221, 235 (E.D. La. 2005)("FEMA does not have the discretion to ignore a mandatory directive.").
[37]    *Sierra Club v. Jackson*, 833 F.Supp. 2d 11, 30 (D.C. D.C. 2012)(citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958))("The Court concludes that the standard for a [§ 705] stay at the agency level is the same as the standard for a

obtain a preliminary injunction, the movant must demonstrate:

> (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest.[38]

When analyzing the degree of "success on the merits," the Fifth Circuit balances hardships to the parties against the degree of likelihood of success.[39] Thus, "when the other factors weigh in favor of an injunction, a showing of *some* success on the merits will justify temporary injunctive relief."[40] In the instant case, each of the relevant factors warrants a stay and/or preliminary injunction to prevent implementation of new rates without completing the studies mandated by the statute.

Section 706 of the APA also provides relief from an agency's failure to act as required: "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."[41] The United States Supreme Court has established that § 706 empowers a court to compel agency action "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."[42] Stated differently, under § 706, a court may compel an agency "to perform a ministerial or non-discretionary act."[43] The United States Supreme Court

---

stay at the judicial level: each is governed by the four-part preliminary injunction test...."); *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 335 (E.D. La. 2011) (issuing preliminary injunction against Department of Interior to comply with non-discretionary duty to act on oil drilling permit applications).

[38] *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 219 (5th Cir. 2010) (citing *Ridgely v. Federal Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008).

[39] *McWaters*, 408 F. Supp. 2d at 228.

[40] *Id.* (emphasis in original).

[41] 5 U.S.C. § 706(1).

[42] *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original).

[43] *Id.*

{N2710726.3}

has specified that such a discrete or non-discretionary agency act would include, "for example, the failure to promulgate a rule or take some decision by a statutory deadline."[44] "[W]hen an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts, upon proper application, must compel the agency to act."[45]  Federal courts routinely compel agency action under § 706 of the APA when a mandatory statutory requirement has not been fulfilled.[46]

**I.      The Plaintiff Has a Substantial Likelihood of Success on the Merits.**

**A.      Defendants have failed to complete studies required by BW-12.**

Defendants have failed to undertake and complete studies mandated by BW-12 by the statutorily imposed deadline in carrying out implementation of BW-12.  The Defendants were obligated to obtain and present the "affordability" report mandated by BW-12 to Congress within nine (9) months after passage of BW-12.  The Defendants were further obligated to deliver that report in April 2013 to provide Congress with the opportunity to study and to review the report for at least six (6) months before the rate increases took effect beginning on and after October 1, 2013. The mandated affordability study is to include an economic analysis of the costs and benefits to the Federal Government of a flood insurance program with full risk-based premiums, combined with means-tested federal assistance to aid individuals who cannot afford coverage, through an insurance voucher program and comparing the costs of a program of risk-based rates

---

[44]      *Id.*

[45]      *Forrest Guardians v. Babbit*, 174 F.3d 1178, 1190 (10th Cir. 1998).

[46]      *See, e.g., Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 336 (E.D. La. 2011) (finding that Congress imposed a non-discretionary duty on the Department of Interior to act on drilling permits "expeditiously" and thus "[n]ot acting at all is not a lawful option" even if agency's resources are strained); *Schoeffler v. Kempthorne*, 493 F. Supp. 2d 805, 823 (W.D. La. 2007) (holding that Congress's use of the term "shall" compelled the Secretary of the Interior to take action on issuing critical habitat designation even after statutory deadline had passed).

and means-tested assistance to the current system of subsidized flood insurance rates and federally funded disaster relief for people without coverage.

Additionally, the Defendants were obligated to enter into other contracts and obtain other studies and information from various third parties no later than the first anniversary of the passage of BW-12.   However, as the Defendants themselves acknowledge, all but one of the required studies and reports to Congress have yet to be conducted within the statutorily imposed deadlines.   The Defendants' failure to timely comply with BW-12's mandatory obligations are multiple discrete agency inactions or failures to act.   These failures mandate a judicial decree under the APA requiring the Defendants to deliver the required reports to Congress and enter into the various contracts and consulting relationships with third parties all before any rate increases are implemented.

As the United States Court of Appeals for the Tenth Circuit explained in *Forrest Guardians v. Babbitt*:

> [W]hen Congress by organic statute sets a specific deadline for agency action, neither the agency nor any court has discretion.   The agency must act by the deadline.   If it withholds such timely action, a reviewing court must compel the action unlawfully withheld.   To hold otherwise would be an affront to our tradition of legislative supremacy and constitutionally separated powers.[47]

Lack of agency resources, including monetary allocation, is no excuse for the failure to act.[48]

**B.     Setting new flood insurance rates without the information to be supplied by the mandated studies would be arbitrary and capricious.**

As noted previously, the various studies mandated by BW-12, including in particular the affordability studies, were intended to give Congress timely information so that it could take

---

[47]     174 F.3d 1178, 1190 (10th Cir. 1999)(compelling the Secretary of the Interior to issue a critical habitat designation for an endangered species under APA since the agency wholly failed to make the designation by the statutory deadline).

[48]     *Id.* at 1192.

{N2710726.3}

steps to ameliorate the impact of removing the subsidies from flood insurance premiums. Congress believed that the information to be developed by these studies was so important that it mandated that the studies be completed within statutory deadlines which were before the new rates were to take effect on October 1, 2013.  It is undisputed that these studies have not been completed.  Moreover, as noted above, the Act obligates the Administrator to use "such other information as may be necessary" in setting rates and he cannot do so without the information that would be developed through these studies.

As explained by the United States Supreme Court, agency action is "arbitrary and capricious" when, *inter alia*:

> [The agency] has  . . . <u>entirely failed to consider an important aspect of the problem,</u> offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[49]

In this case, "it is clear that the agency entirely failed to consider important aspects of the problem in their decisions."[50]  Particularly, the Defendants' noncompliance with BW-12's mandatory affordability study and report to Congress for evaluation prior to rate increase implementation demonstrates a lack of contemplation and consideration of the effect of such rate increases on the affordability of the NFIP.

---

[49]    *Motor Vehicle Mfrs. Association of U.S. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (U.S. 1983) (emphasis added); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (reviewing court may overturn an agency's action as arbitrary and capricious if the agency failed to consider relevant factors, failed to base its decision on those factors, and/or made a "clear error of judgment"), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

[50]    *Chiang v. Kempthorne*, 503 F. Supp. 2d 343, 352 (D.C. D.C. 2007) (holding the Department of Interior and the Minerals Management Service wholly failed to address critical concerns of the State of California in issuing mineral royalty audit guidelines and thus was in violation of the APA).

## II.   A Substantial Threat of Irreparable Injury Exists if the Defendants Proceed With Implementation of the NFIP Rate Increases Without Completing the Mandated Studies.

A substantial threat of irreparable injury exists to NFIP policyholders and property owners in areas at risk of flooding if the Defendants are allowed to implement the new rates without first being required to complete the studies mandated by BW-12.  Without the crucial information and data that these studies will provide, Congress and the Defendants will lack the necessary information to properly set rates and would be engaged in arbitrary and capricious decision-making if they were to implement the new rates.  Moreover, if the Defendants proceed with the implementation of the BW-12 rate increases without the information from the required studies, the stated intent of the NFIP would be thwarted because flood insurance premiums will become unaffordable.

A substantial threat of irreparable injury exists if the injunction is not granted because of imminent and dramatic increases in insurance premiums which will otherwise go into effect soon after October 1, 2013.  Moreover, purchasing private flood insurance is not an option for most property owners in flood prone areas. The Flood Disaster Protection Act of 1973 requires that those buying, building, or improving property in special flood hazard areas purchase flood insurance as a prerequisite for receiving any type of direct or indirect federal financial assistance (e.g., any loan, grant, guaranty, insurance, payment, subsidy, or disaster assistance).[51]  The NFIP prohibits federally regulated lending institutions from making any real estate loans in a special flood hazard area unless the property is covered by flood insurance.[52]  If the borrower fails to buy such insurance within forty-five days of being notified, the lender is required to buy it for the

---

[51]     *See* 42 U.S.C. § 4012a;  *Hofstetter v. Chase Home Fin., LLC,* 2010 U.S. Dist. LEXIS 84050, 2010 WL 3259773, at *4 (N.D. Cal. Aug. 16, 2010).

[52]     42 U.S.C. § 4012a (b).

{N2710726.3}

borrower and charge the costs back to the borrower.[53]   This practice is commonly known as "forced placement" of flood insurance. These laws mandate that all federally insured lenders must obtain flood insurance coverage even if the owner of a mortgaged building is unwilling or unable to afford such coverage.   If flood insurance becomes unaffordable as the result of FEMA's failure to comply with the NFIP's "affordability" mandate, citizens of Louisiana and Mississippi will increasingly become ineligible for direct or indirect federal financial assistance (e.g., any loan, grant, guaranty, insurance, payment, subsidy, or disaster assistance) when the building or personal property is security for federally insured loans.

Numerous residents of Louisiana and Mississippi applied for and received FEMA grants and other benefits in good faith following Hurricane Katrina, conditioned in part upon their continued participation in NFIP.   At the time they did so, the NFIP rates were reasonable and were anticipated to remain so based on the stated purposes of the NFIP.   Moreover, those that rebuilt did so in compliance with the then-applicable BFEs.   If flood insurance premiums escalate beyond affordability because of BW-12, the recipients of such grants and other benefits may be subjected to adverse action by FEMA or their lenders over which they have no practical control.   This significant threat of irreparable injury to the public, coupled with the Defendants' failure to complete the studies mandated by BW-12, render the Defendants' implementation of the BW-12 rate increases *per se* arbitrary and capricious and in violation of the APA.[54]

In some circumstances, the new Flood Insurance Rates will result in an unconstitutional taking of property.   Following Hurricane Katrina, many rebuilt their homes to the BFEs then in effect. Unfortunately, FEMA's subsequent remapping pursuant to BW-12 has resulted in significant

---

[53]   42 U.S.C. § 4012a (e)(2).
[54]   *See* 5 U.S.C. § 706(2)(A)-(F).

{N2710726.3}

increases to the BFE level.  As a result, many homes thought to have been built at or over the BFE that was then in effect are now several feet below the new BFE level.  Flood insurance premiums for buildings below BFE are dramatically higher than the premiums for buildings at or above BFE.  This results in properties being subject to drastic increases in flood insurance premiums even though they were built in compliance with the BFE in effect at the time.

Admittedly, such homeowners are currently entitled to "grandfathered rates,"  but these "grandfathered rates" are being phased out and will disappear if the homeowner's policy lapses.  More importantly, if a property owner tries to sell his property, the prospective purchaser will no longer be entitled to keep the grandfathered rates, but will instead have to pay rates based on the new BFE.  Because the prospective  purchaser will be faced with the requirement of buying flood insurance at non-subsidized rates which reflect that the property is below the new BFE, the purchaser will either refuse to go through with the purchase or will demand that the purchase price be adjusted downward to account for the increased rates.  In other words, BW-12 will significantly diminish property values.

The story of Mr. Nicosia, whose affidavit is attached to Plaintiff's motion as Exhibit "4," illustrates this point well.  Mr. Nicosia rebuilt after Hurricane Katrina in accordance with the FIRMS in effect at the time.  Based on those maps, Mr. Nicosia's property was in an A-zone requiring a thirteen foot BFE.  Although Mr. Nicosia rebuilt to twenty (20) feet, seven feet above the BFE in effect at the time, due to the change in FIRMs mandated by BW-12, he is now in a V-zone and three feet *below* the new BFE.  Although Mr. Nicosia's 2012 flood insurance premium was $452, because his house is on the market, any purchaser would have to pay, up-front, the estimated $16,500 annual full-risk rate.  A prospective purchaser faced with this *annual* cost,

will either refuse to go through with the purchase or will demand a reduction in the purchase price.

The dramatic decrease in property values will, in turn, decrease the value of the security that banks and lending institutions hold as security for their loans. As the last economic recession has amply demonstrated, this could result in real estate foreclosures and possibly threaten the financial stability of financial institutions that have lent heavily in those areas affected by the rate increases mandated by BW-12. Many of these financial institutions are still recovering from the last economic recession.

The United States Supreme Court has recognized that government regulation may under certain circumstances result in a taking of property in violation of the Takings Clause of the Fifth Amendment of the United States Constitution. When a regulation does impose permanent physical invasion of property or deprive the owner of all beneficial use of his property, the test for whether the governmental action constitutes a taking requiring compensation is set forth in *Penn Central Transportation Company v. City of New York.*[55] In *Penn Central*, the Supreme Court identified several factors to be considered in determining whether governmental regulation rises to the level of a taking requiring just compensation.[56] The Court further noted that the determination should be an "essentially ad hoc, factual inquir[y]" rather than conducted according to any "set formula."[57] These considerations include: (1) the regulation's economic impact on the claimant; (2) the extent to which the regulation interferes with distinct investment-

---

[55]  438 U.S. 104 (1978); *see also Lingle*, 544 U.S. 528, 528 (affirming the *Penn Central* test as the default test for regulatory takings claims).

[56]  *Id.* at 124.

[57]  *Id.*

backed expectations; and (3) the character of the governmental action.[58]   The *Penn Central* Court explained that regulations "may so frustrate distinct investment-backed expectations as to amount to a 'taking.'"[59]   In *Lingle*, the Supreme Court stated that "the Penn Central inquiry turns in large part…upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests."[60]

Application of these factors to the NFIP policyholders and affected property owners warrants a finding that their property has been taken in violation of the Takings Clause of the Fifth Amendment.   As to the first factor, it is evident from affidavits attached to the Complaint, as well as from the examples cited in the section above on the Interest of Amicus Curiae, that the substantial rate increases resulting from BW-12 will have a tremendous economic impact on NFIP ratepayers, many of whom are low or middle income and cannot afford to pay the new rates.   The second factor relates to interference with investment backed expectations.   Those property owners who built or purchased property that was in compliance with the BFE made substantial investments in their property with the reasonable expectation that if built in compliance with flood insurance guidelines in effect at that time, it would remain in compliance, or if not, would benefit from continuing "grandfathered rates" recognizing the prior compliance. The third factor relates to the character of the government action.   Here the government actions altered the status of property built in compliance with applicable flood insurance standards, made it non-compliant, and as a result, imposed significant additional costs on the property owner and greatly diminished the value of the property.

The substantial economic threat to Mississippi and Louisiana citizens and financial

---

[58]   *Id.*
[59]   *Id.* at 127.
[60]   544 U.S. at 540.

{N2710726.3}

institutions affected by the BW-12 rate increases is sufficient to warrant preliminary injunctive relief.[61] The irreparable injury suffered by those who may be displaced from their homes due to the BW-12 rate increases, or those whose property values have been, or will be, dramatically reduced by virtue of these rate increases, is not readily compensable in damages and warrants the issuance of a preliminary injunction to maintain the status quo pending trial on the merits. Thus, the second factor weighs heavily in favor of granting a preliminary injunction.

## III.   The Imminent Threat of Economic Injury Outweighs the Burden of Complying With Congressional Mandates.

The harm threatened to the public outweighs any harm that will result to the Defendants if the preliminary injunction is granted. Plaintiff is simply seeking to stay implementation of new flood insurance rates and to maintain the status quo until this Court decides the case on the merits. After trial on the merits, Plaintiff merely seeks to have the Court compel the Defendants to comply with the mandates already contained in BW-12 and delay implementation of new rates until they have done so. In contrast, the threatened injury to NFIP policyholders and property owners in flood prone areas is great. Individual policyholders who are not able to afford the increased premium may face foreclosure. Additionally, homeowners who may seek to sell their homes will be faced with dramatic decreases in property values and a shortage of prospective purchasers. Thus, the burden, if any, on the Defendants to delay rate increases until they have complied with Congressional mandates is far outweighed by the threat of harm to NFIP policyholders and property owners in flood prone areas that would ensue if a stay and/or

---

[61]    *See Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1985).

{N2710726.3}

preliminary injunction were not granted. Therefore, Plaintiff has satisfied the third prerequisite for preliminary injunctive relief.

**IV.    A Stay or Injunction Would Serve the Public Interest.**

A stay and/or injunction will serve the public interest because it seeks to require the Defendants to take the steps which Congress has mandated. It will preserve property values for the time being and will prevent foreclosures caused by premium increases resulting from the Defendants' implementation of BW-12. Preventing foreclosures will preclude a financial ripple effect similar to that experienced in the last recession. Finally, compelling Defendants to comply with existing Congressional mandates is clearly in the public interest. As such, the fourth factor likewise warrants injunctive relief.

## CONCLUSION

For the foregoing reasons, this Court should stay or grant a preliminary injunction to prevent the Defendants from raising NFIP flood insurance premiums until after a trial on the merits and even then, until after the Defendants have completed the studies and reports that BW-12 require.

Respectfully submitted,

LOUISIANA INSURANCE DEPARTMENT,
by and through JAMES DONELON,
COMMISSIONER OF INSURANCE FOR THE
STATE OF LOUISIANA

BY:
/s/ Holmes S. Adams_____
*One of Its Attorneys*

HOLMES S. ADAMS (MS Bar No. 1126)
ADAMS AND REESE LLP
1018 Highland Colony Parkway, Suite 800
Ridgeland, MS 39157
Telephone:  (601) 353-3234

EDWARD H. BERGIN (La. Bar. No. 02992)*
Jones Walker LLP
201 St. Charles Avenue, 51st Floor
New Orleans, Louisiana 70170
Telephone:  (504) 582-8222

S. TRENT FAVRE (Miss. Bar No. 99578)
Jones Walker LLP
Suite 1125
2510 14th St
Gulfport, MS 39501

MARK J. SPANSEL (La. Bar. No. 12314)*
JENNIFER E.  BARRIERE (La. Bar. No. 34435)*
ADAMS AND REESE LLP
One Shell Square
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Telephone: (504) 585-0215
* Applications for admission pro hac vice will be filed upon a ruling on this Motion.

## CERTIFICATE OF SERVICE

I, the undersigned counsel, do hereby certify that I have this day electronically filed the above and foregoing pleading or other paper with the Clerk of Court using the ECF system which sent notification of such filing to the following:

All counsel of record registered with the ECF system.

I further certify that I have on this day caused to be hand delivered the above and foregoing pleading or other paper to the following:

Gregory K. Davis or One of His Designated Assistants
United States Attorney for the Southern District of Mississippi

{N2710726.3}

1575 20th Avenue, 2nd Floor
Gulfport, Mississippi 39501

I further certify that I have on this day caused to be mailed by United States certified mail

the above and foregoing pleading or other paper to the following:

Eric H. Holder, Jr.
United States Attorney General
United States Department of Justice
Attn: Civil Process Clerk
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

The Honorable Rand Beers, Secretary
United States Department of Homeland Security
Washington, DC 20528

W. Craig Fugate, Administrator
Federal Emergency Management Agency
United States Department of Homeland Security
500 C Street, SW
Washington, DC 20472

This the ____th day of November, 2013.

_____
Of Counsel

{N2710726.3}