THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

_____
                                        )
MISSISSIPPI INSURANCE DEPARTMENT,       )
by and through MICHAEL J. CHANEY,       )
Commissioner of Insurance for the State of  )
Mississippi                             )
                                        )
                 Plaintiff,             )
                                        )
        v.                              )
                                        )   Case No. 1:13-cv-379-LG-
UNITED STATES DEPARTMENT OF             )   RHW
HOMELAND SECURITY; RAND BEERS,          )
in his official capacity as the Secretary of the  )
United States Department of Homeland Security;  )
UNITED STATES FEDERAL EMERGENCY         )
MANAGEMENT AGENCY; W. CRAIG             )
FUGATE, in his official capacity as the  )
Administrator of the United States Federal  )
Emergency Management Agency             )
                                        )
                 Defendants.            )
_____)


MEMORANDUM BRIEF IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS

## I.     INTRODUCTION

In the Biggert-Waters Flood Insurance Reform and Modernization Act of 2012

("BW-12"), Pub. L. No. 112-141, Congress instructed the Federal Emergency

Management Agency ("FEMA") to implement insurance premium rate increases by

transitioning subsidized and grandfathered rates to actual risk-based rates for certain

properties covered under the National Flood Insurance Program ("NFIP").  As this

memorandum will demonstrate, this Court lacks jurisdiction to consider Plaintiff's claims challenging Defendants' implementation of certain rate increases.

Plaintiff has not alleged facts sufficient to demonstrate that it has standing to bring the claims that it has asserted, nor could it. Plaintiff alleges no injury to itself, as an agency of the State, and Supreme Court precedent forecloses Plaintiff from bringing its claims on behalf of Mississippi citizens. Nor has Plaintiff shown that, if it could overcome these obstacles, an order from the Court will redress any injuries Plaintiff alleges. Contrary to what Plaintiff suggests in its Amended Complaint, BW-12 does not require that any study or report be completed before Defendants implement those sections of BW-12 that Plaintiff challenges here. In fact, the plain language of BW-12 makes clear that Congress never intended for the study Plaintiff focuses on (contained in section 100236 of BW-12) to be completed before Defendants implemented the changes at issue. There is therefore no legal basis to halt implementation of any portion of BW-12. Moreover, because Congress did not tie the completion of any study or report to the implementation of rate increases in BW-12, Plaintiff's hypothesis that completion of these reports might affect premium rate increases in general, let alone for certain properties, requires numerous layers of pure speculation. Indeed, because Defendants lack the authority to alter implementation of BW-12 in the ways Plaintiff desires, the relief Plaintiff seeks can only come from Congress.

This Court also lacks jurisdiction over Plaintiff's claims because the activities that Plaintiff asks this Court to compel – the studies and reports to Congress – do not constitute "agency action" reviewable under the Administrative Procedure Act ("APA"), which is the only cause of action Plaintiff advances here. Finally, to the extent that

Plaintiff asks this Court to enjoin the implementation of Section 100207 of BW-12, that request is not ripe for review because FEMA has made clear that it does not intend to implement that section of BW-12 for at least a year.  For the foregoing reasons, as further explained below, Defendants' Motion to Dismiss should be granted.

II.     BACKGROUND

    A. **Relevant Statutory Provisions**

       *1. The National Flood Insurance Program*

Flooding has been, and continues to be, a serious risk in the United States.  *See* Exhibit 1 to Defendant's Response to Plaintiff's Motion for a Stay, or in the Alternative, for Preliminary Injunction, Declaration of David Andrew Neal ("Neal Decl.") ¶ 6.  Most insurance companies specifically exclude flood damage from homeowners insurance for this reason.  *See id.*

FEMA administers the NFIP pursuant to the National Flood Insurance Act of 1968 ("NFIA").  42 U.S.C. §§ 4001 *et seq.*  Congress originally established the NFIP as a Federal program to identify and communicate flood hazards and risk, to address the need for flood insurance and to enable property owners in participating communities to purchase flood insurance, and to encourage community-based flood mitigation.  *See* Neal Decl. ¶ 6.  FEMA identifies flood hazards and flood risk zones using Flood Insurance Rate Maps ("FIRMs").  *See* 44 C.F.R. § 4101(e)-(f).

NFIA requires FEMA to set flood insurance premium rates "based on consideration of the risk involved and accepted actuarial principles," and to include administrative and operating expenses incurred in carrying out the NFIP in those rates.  *See* 42 U.S.C. § 4014(a)(1).  FEMA refers to these rates as full-risk rates.  To encourage

participation in the NFIP, Congress also authorized FEMA to set rates at less than full-risk rates, which FEMA refers to as subsidized rates. *See* 42 U.S.C. § 4014(a)(2). Congress later amended the NFIA to prohibit FEMA from offering subsidized rates to Post-FIRM properties (properties that were constructed or substantially improved after December 31, 1974, or after the date upon which FEMA published the first FIRM for the community, whichever was later). *See* 42 U.S.C. § 4015(c); Pub. L. No. 93-234 § 103(c) (Dec. 31, 1973). In other words, Congress permitted FEMA to offer subsidized rates for those properties where the flood risks were unknown at the time they were constructed, *i.e.*, before the initial FIRMs were published. *See* 42 U.S.C. § 4015(c); Pub. L. No. 93-234 § 103(c) (Dec. 31, 1973). *See also* Neal Decl. ¶ 6. FEMA refers to this subsidy as the pre-FIRM subsidy. Moreover, prior to BW-12, FEMA was prohibited from raising pre-FIRM subsidies by more than 10 percent a year. *See* Pub. L. No. 103-325 § 572(a)(2) (Sept. 23, 1994); Pub. L. No. 112-141 § 100205 (July 6, 2012). Since the NFIP was established, the costs and consequences of flooding have continued to increase, especially after Hurricane Katrina in 2005 and Hurricane Sandy in 2012. *See* Neal Decl. ¶ 6.

> 2.  *BW-12*

On July 6, 2012, Congress enacted BW-12 to extend the NFIP for five years while requiring significant program reform. *See* Neal Decl. ¶ 7; Exhibit 2 to Defendant's Response to Plaintiff's Motion for a Stay, or in the Alternative, for Preliminary Injunction, Declaration of Arturo de la Cruz ("de la Cruz Decl.") ¶ 4. The Act requires changes to all major components of the program, including flood insurance, flood hazard mapping, grants, and the management of floodplains. *See* Neal Decl. ¶ 7, de la Cruz Decl. ¶ 4. The changes are designed to make the NFIP more financially stable, and to

ensure that flood insurance rates more accurately reflect the true risk of flooding.  *See* Neal Decl. ¶ 7, de la Cruz Decl. ¶ 4.  Three sections of BW-12 are most relevant to the allegations in Plaintiff's Amended Complaint.

> ### a.  Section 100205

First, subsections 100205(a)(1) and 100205(c)(3)[1] require FEMA to phase-out certain pre-FIRM subsidies by increasing subsidized premiums 25% a year until the full-risk rate is reached for the following types of pre-FIRM properties:  (a) non-primary residential properties; (b) severe repetitive loss properties;[2] (c) any property that has incurred flood damage in which the cumulative amounts of flood insurance payments equals or exceeds the fair market value of the property; (d) any business property; and (e) any property that, on or after July 6, 2012, has experienced or sustained substantial damage or improvement.  *See* 42 U.S.C. §§ 4014(a)(2), 4015(e)(2).  *See also* Neal Decl. ¶ 8, de la Cruz Decl. ¶ 5.  BW-12 also prohibits FEMA from offering subsidized rates for the following previously eligible pre-FIRM properties: (a) property not insured as of July 6, 2012; (b) any property purchased after July 6, 2012; (c) any policy that lapses as a result of the policy holder's deliberate choice; and (d) any prospective insured who refuses to accept an offer for mitigation assistance by the Administrator.  *See* 42 U.S.C. § 4014(g); Pub. L. No. 112-141 § 100205(a)(1)(B).  *See also* Neal Decl. ¶ 8, de la Cruz Decl. ¶ 5.  Except for properties not covered by an NFIP policy or purchased after BW-12 was enacted, Section 100205(a)(2) of BW-12 states that "[t]he amendments made by

---

[1]  Section 100205(a)(1) identifies the types of properties subject to the phase-out while Section 100205(c)(3) sets the permissible rate for premium increases.

[2]  Section 100205(a)(1) of BW-12 contains a definition of "severe repetitive loss property" which is codified at 42 U.S.C. § 4014(h).

paragraph (1) [amending § 4014(a)(2) and adding subsections (g)(3)-(4)[3] and (h)]  shall become effective 90 days after the date of enactment of this Act."[4]

On January 1, 2013, FEMA began phasing out subsidized premiums for all non-primary residential properties.[5]  *See* de la Cruz Decl. ¶ 6.  On October 1, 2013, FEMA began phasing out pre-FIRM subsidies for businesses, non-residential properties, and severe repetitive loss properties.  *See id.* ¶¶ 6-8.[6]  Major changes to NFIP, such as premium rate changes, require many months of planning and development of standards, processes, and systems.  *See id.* ¶¶ 6-7.  Moreover, FEMA provides stakeholders, such as flood policyholders, detailed requirements, guidance, and instructions at least six months in advance of any change to allow them sufficient time to prepare for and implement program adjustments.  *See id.* ¶ 8.  Because FEMA has historically made changes to the NFIP two times a year – on May 1st and October 1st –  FEMA chose October 1, 2013 as the implementation date.  *See id.* ¶ 7.

---

[3]  As stated, *supra*, Section 205 prohibits FEMA from offering pre-FIRM subsidies for any properties "not insured" by the NFIP as of the date BW-12 was enacted or "any properties purchased after" BW-12 was enacted.  Pub. L. No. 112-141 § 100205(g)(1)-(2).

[4]  The effective date provided in Section 205(a)(2) does not apply to non-primary residential properties, because Section 205(e) of BW-12 explicitly states that those properties are subject to the deadline for the first increase in chargeable risk premium rates provided by Congress in an Act passed earlier in 2012.  *See* "An Act to extend the National Flood Insurance Program, and for other purposes."  Pub. L. No. 112-123 § 2(c) (May 31, 2012).

[5]  These subsidies were phased out earlier due to the language of Section 205(e) of BW-12, discussed in footnote 4, *supra*.

[6]  FEMA is unable to phase out subsidies for substantial improvement property until it changes its regulatory definition of substantial improvement.  *See* de la Cruz Decl. ¶ 6.  FEMA does not have to revise FEMA's definition of substantial damage because its regulatory definition is in line with the damage threshold set out in BW-12.  *See id.*

Remaining primary residences with policies in place at the time BW-12 was enacted will keep their subsidized premiums until the property is sold or the policy has lapsed as a result of deliberate choice.  If the property is sold, or a new policy is purchased, after July 6, 2012, upon the renewal of the policy, FEMA will charge these policyholders the full-risk rate, as required by 42 U.S.C. § 4014(g).

> b.  *Section 100207*

Section 207 of BW-12, codified in relevant part at 42 U.S.C. § 4015(h), requires FEMA to phase in full-risk rates over a five-year period for any property located in an area with a revised or updated FIRM.  Section 207 will eliminate FEMA's practice of offering grandfathered rates to properties subject to changing risk based on revised FIRMs.  *See* Neal Decl. ¶ 8, de la Cruz Decl. ¶ 5.  FEMA currently anticipates that implementation of Section 207 will not begin for at least one year. *See* Neal Decl. ¶ 17.

> c.  *Studies and Reports*

Finally, BW-12 requires that the government conduct a number of studies and issue corresponding reports to certain Congressional committees.  *See* Pub. L. No. 112-141 §§ 100231-100237.  Plaintiff's Amended Complaint focuses primarily on the "affordability" study and report required by Section 236.  Section 236 requires the Administrator of FEMA to conduct a study and issue a report to Congress assessing "methods for establishing an affordability framework for [NFIP], including methods to aid individuals to afford risk-based premiums under [NFIP] through targeted assistance rather than generally subsidized rates, including means-tested vouchers."  *Id*. § 100236(a)(3).  To complete the study, FEMA must enter into a contract with the National Academy of Sciences to conduct "an economic analysis of the costs and benefits

. . . of a flood insurance program with full risk-based premiums, combined with means-tested Federal assistance to aid individuals who cannot afford coverage, through an insurance voucher program." *Id*. § 100236(b).  Additionally, the Administrator is not permitted to use more than $750,000 from the National Flood Insurance Fund, of amounts not otherwise obligated, to carry out Section 236.  *See id*. § 100236(d).  A report containing the results of the study and analysis mentioned above was due to be submitted to committees of the House of Representatives and the Senate 270 days after the enactment of BW-12.  *See id*. § 100236(c).

In February 2013, FEMA began discussions with NAS and others regarding the requirements for the affordability study.  *See* Neal Decl. ¶ 12.  All parties concluded that additional time and funding were needed to complete the full scope of work contemplated in Section 236.  *See id*.  On April 18, 2013, FEMA received a letter from NAS explaining that NAS could not complete its analysis under the time and funding constraints provided for in BW-12.  *See id*. ¶ 13.  A copy of that letter is attached as Exhibit A to the Neal Declaration.  In that letter, NAS proposed a two-phase approach to the analysis.  *See id*. ¶ 14.  The first phase would focus on the design of the analysis and the second phase would involve execution of the analysis.  *See id*.  FEMA contracted with NAS regarding phase one of the analysis in August of 2013.  *See id*. ¶ 15.  Phase one is expected to be completed in March of 2015.  *See id*.  After receiving the letter from NAS in April of 2013, FEMA formally notified Congress of the delays, as well as funding constraints, in completing the affordability study. *See id*. ¶ 16.

### B. **Plaintiff's Claims**

Plaintiff challenges FEMA's phasing out of below-risk premium rates before the affordability study required in Section 236 is complete.  Specifically, Plaintiff claims that FEMA is violating an express statutory mandate to complete the study in a specific time period, and that FEMA's failure to do so constitutes an agency action unlawfully withheld or unreasonably delayed under the APA, 5 U.S.C. § 706(1).  Plaintiff seeks declaratory and injunctive relief that will prevent FEMA from continuing to implement rate increases that began on October 1, 2013 until the affordability study is completed.

### C. **Procedural Background**

On September 26, 2013, the Mississippi Insurance Department ("MID" or "Plaintiff"), by and through Michael J. Chaney, the Commissioner of Insurance, filed a complaint in this Court against the United States Department of Homeland Security ("DHS"), Rand Beers (in his official capacity as the Acting Secretary of DHS), FEMA, and W. Craig Fugate (in his official capacity as Administrator of FEMA) (collectively "Defendants").  *See* DE # 1.  FEMA is a component of DHS.  Plaintiff then filed an Amended Complaint against all Defendants on October 7, 2013.  *See* DE # 5.  On October 10, 2013 Plaintiff filed a Motion for Stay, or, in the Alternative, for Preliminary Injunction.  *See* DE # 9, 10.  The Court conducted a status conference on October 16, 2013 and entered an initial scheduling order on October 17, 2013 setting forth a schedule for briefing on Plaintiff's motion as well as any dispositive motion by Defendants challenging the Court's jurisdiction over Plaintiff's claims.  *See* DE # 12.

### III.    LEGAL ARGUMENT

#### A.  <u>**Plaintiff Does Not Have Standing to Bring this Action**</u>

Plaintiff's Amended Complaint should be dismissed because MID does not have standing to bring the claims it asserts.  "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III [of the Constitution]," and it is fundamental to the court's jurisdiction to hear a case.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The "irreducible constitutional minimum of standing" requires a plaintiff to demonstrate that: (1) it has suffered an injury in fact; (2) the existence of a causal connection between the alleged injury and conduct that is fairly traceable to the defendant; and (3) it is likely the requested relief will redress the alleged injury.  *Id*. at 560–61.  Plaintiff "bear[s] the burden to demonstrate standing for each claim" alleged in its Complaint.  *Nat'l Fed'n of the Blind of Tex. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011).  Plaintiff has not and cannot demonstrate any of these elements as to itself, and is precluded from bringing this action on behalf of Mississippi residents as a matter of law.

#### 1.  *Plaintiff Has Not Suffered an Injury on Which it Can Rely for Standing*

First, Plaintiff cannot demonstrate that it has standing to challenge BW-12 because it has failed to identify an injury it has suffered from the statute.  To satisfy the injury-in-fact element of standing, Plaintiff must articulate an injury to itself that is concrete, actual or imminent, and particularized – *i.e.* it "must affect the plaintiff in a personal and individual way."  *Lujan*, 504 U.S. at 560-61 n.1.  Plaintiff has not met its burden.

The fact that Plaintiff is "an agency of the State of Mississippi" empowered to bring suit in the name of the State, Am. Compl. ¶ 8, describes Plaintiff's purported

authority to act, but Plaintiff's Amended Complaint alleges no injury to itself or to the

State.  The only allegations of injury found in the Amended Complaint are allegations of

injury to Mississippi NFIP policyholders.  *See, e.g.*, *id.* ¶ 4 (alleging that implementation

of BW-12 "will have a devastating impact on the citizens of Mississippi"); ¶ 7 ("some of

the most egregiously affected persons reside in the Gulf Coast area of the State of

Mississippi"); ¶ 46 (alleging injury to Mississippi residents and lenders).  Therefore,

Plaintiff cannot demonstrate that it has standing to bring its claims.

> 2.  *Plaintiff Cannot Satisfy the Injury Requirement Under the Rubric of Parens Patriae*

As noted above, the Amended Complaint suggests that Plaintiff is attempting to

assert the rights of Mississippi citizens rather than its own rights.  *See id.* ¶ 30 (stating

that Plaintiff "seeks a declaration of the rights and other legal relations between FEMA

and the citizens of the State of Mississippi, which it represents"); ¶ 44 (alleging that

Plaintiff is entitled to relief to prevent irreparable injury to "the people of Mississippi,

and NFIP policyholders").  Because Supreme Court precedent forecloses a State agency

from suing the federal government on behalf of the State's citizens to protect those

citizens from the operation of federal law, any attempt to rely on the injuries of

Mississippi citizens and thereby characterize this action as one in *parens patriae* must be

rejected.

The doctrine of *parens patriae* permits a State to sue to vindicate the interests of

its citizens in some instances, however, it cannot provide Plaintiff with standing to

challenge FEMA's implementation of BW-12.  The Supreme Court made clear more than

80 years ago that a State cannot bring a *parens patriae* action against federal defendants

to protect a State's citizens from the operation of federal statutes.  *See Massachusetts v.*

*Mellon*, 262 U.S. 447, 485-86 (1923).  This is because citizens of a state "are also citizens of the United States," and therefore "[i]t cannot be conceded that a state, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof."  *Id*. at 478, 485.  The Court stressed that "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government;" "it is the United States, and not the state, which represents [its citizens] as *parens patriae*."  *Id*. at 485-86.  The Supreme Court has consistently applied this principle since *Mellon* to dismiss actions brought by a State as *parens patriae* against federal defendants.  *See Florida v. Mellon*, 273 U.S. 12, 18 (1927) (relying on *Massachusetts v. Mellon* to dismiss Florida's challenge to a federal inheritance tax based on alleged injury to its citizens); *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966), *abrogated on other grounds by Shelby Cnty. v. Holder*, 133 S.Ct. 2612 (2013) (concluding that South Carolina lacked standing as *parens patriae* to invoke the Due Process Clause or the Bill of Attainder Clause against the federal government); *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982) ("A State does not have standing as *parens patriae* to bring an action against the Federal Government."); *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (observing that *Mellon* "prohibits" allowing a state "'to protect her citizens from the operation of federal statutes'").[7]

_____

[7]  Several Courts of Appeals have also applied this principle to dismiss actions brought by agents of the State on behalf of the State's citizens and against agencies of the federal government.  *See, e.g.*, *Virginia. ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269, 271 (4th Cir. 2011) (Virginia could not bring suit against federal agency to protect its citizens from the operation of a federal health care statute); *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 676 (7th Cir. 2008) (Illinois Attorney General did not have standing to sue in a *parens patriae* capacity to challenge the EPA's failure to act) (citing *Mellon*);

Because Plaintiff, as an agency of the State of Mississippi, cannot bring a *parens patriae* action against an agency of the federal government to protect Mississippi citizens from injuries they allegedly will suffer by the operation of federal law, and no other injuries are alleged in Plaintiff's Amended Complaint, the Amended Complaint does not allege the sort of harm that is necessary to satisfy the injury criterion for standing.

  3.  *The Relief Plaintiff Requests Will Not Redress Any Alleged Injury*

Even if the Amended Complaint alleged the existence of the sort of injury necessary to satisfy the constitutional standing requirement, Plaintiff still could not establish standing because it cannot show that the relief it requests will redress the injury it alleges.

  a.  *Congress Never Intended the Studies and Reports to be Completed Before Section 205 Was Implemented*

First, although Plaintiff seeks declaratory and injunctive relief in connection with FEMA's efforts to implement Section 205 of BW-12 before completing certain studies required by that Act, an order from this Court directing Defendants to complete the affordability study required by Section 236 will do nothing to redress the injuries Plaintiff alleges Mississippi residents are suffering.  *See* Am. Compl. ¶¶ 35, 42.  This is because the plain language of subsections 205(e), 205(a)(1)(B) (42 U.S.C. § 4014(g)(1)-(2)), and 205(a)(2) explicitly mandate when the premiums must be phased out or eliminated, without regard to any other action that BW-12 directs FEMA to undertake.   Therefore,

---

*Iowa ex rel. Miller v. Block*, 771 F.2d 347, 354-55 (8th Cir. 1985) (concluding Iowa lacked standing as *parens patriae* to sue federal defendants to compel implementation of federal disaster relief programs because it "would intrude on the sovereignty of the federal government and ignore important considerations of our federalist system"); *Pennsylvania v. Kleppe*, 533 F.2d 668, 676-80 (D.C. Cir. 1976) (State did not have *parens patriae* standing to bring action to challenge the government classification of certain hurricane ravaged areas or to require continued federal relief).

Congress did not condition the implementation of rate increases on the completion of any studies.

Plaintiff makes much of the October 1, 2013 implementation date, implying that it was a date selected by Congress; however, this date does not appear anywhere in BW-12 itself.  FEMA unilaterally chose this date because it took substantial time and resources to develop and implement significant programmatic and system changes needed to properly adjust the premiums.  *See* de la Cruz Decl. ¶¶ 6-8.  FEMA focused on non-primary residences first because the phase-out of those subsidies was required by an earlier law reauthorizing the NFIP.  *See id*. ¶ 6.  Given the plain language of Section 205(a)(2) and the requirement in Section 205(a)(1)(B) applying actuarial rates for "any property" not insured as of, or purchased after, BW-12's date of enactment, the Court cannot order FEMA to delay implementation of Section 205 until certain reports are completed.[8]  For that reason, the Court cannot issue an order that would redress the injury Plaintiff contends others are experiencing due to the implementation of Section 205 before the studies are completed.

---

[8]  Plaintiff alleges that it was arbitrary and capricious for FEMA to proceed with the implementation of Section 205 without completing certain studies and reports, *see* Am. Compl. ¶ 26, but makes clear that it seeks relief only pursuant to 5 U.S.C. § 706(1).  *See id*. ¶¶ 5, 33-41.  *See also* Pl.'s Mem. Prelim. Inj. at 13-18.  Therefore, any discussion of the review standards applied to a claim pursuant to 5 U.S.C. § 706(2)(A) (providing that a court can "hold unlawful, and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law") by Plaintiff or *amici* is legally irrelevant because Plaintiff has not asserted such a claim.

    b. *Plaintiff's Speculation That Completion of the Reports Will Lead to Changes in the Implementation of BW-12 Does Not Demonstrate Redressability*

  All of the studies and reports mandated by BW-12 will be submitted to Committees of the House of Representatives and the Senate when they are completed by FEMA.  It will then be up to Congress to consider the reports and determine what, if anything, it should do with the information contained in them.  In other words, the completion of the studies and reports will not automatically lead to any action, and thus, "no legal consequences flow from" them.  *Guerrero v. Clinton*, 157 F.3d 1190, 1194 (9th Cir. 1998).  No matter what the contents of the reports may be, they are simply documents "submitted to Congress that Congress has no obligation to consider, let alone act upon."  *Id.*  Rather, the reports are purely informational.  *See id.* at 1195.  While a report that recommends particular actions to address affordability issues raised by the implementation of Section 205 "might have a better chance of getting some member of Congress's attention, it carries no greater clout than that."  *Id.*  The studies and reports in and of themselves have no "determinative or coercive effect upon the action" of Congress or FEMA.  *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154 (1997)).  For this reason, Plaintiff cannot show that an order directing Defendants to complete the study and report mandated by Section 236 – or any other study or report required by BW-12 – will redress the injuries Plaintiff alleges.  *See id.* (because "no legal consequences flow[ed]" from report to Congress and the report had no "determinative or coercive effect upon the action of someone" that produced the plaintiffs' injury, "the relief requested . . . cannot make any legal difference that will redress" the plaintiffs' injury).  *See also Wilderness Soc'y v. Norton*, 434 F.3d 584, 590-93 (D.C. Cir. 2006) (plaintiff did not have standing to seek

order compelling agency to forward completed wilderness recommendations to the

President or to complete wilderness suitability assessments for certain parks because

Congress would still have to decide whether to designate the lands as wilderness) (citing

*Guerrero*).

       c.   *FEMA Does Not Have the Authority to Implement the Methods*
           *Examined in the Affordability Study*

      Plaintiff also cannot satisfy the redressability prong of the standing requirement

because the methods that Congress asked the Administrator to consider in the

affordability study mandated by Section 236 are methods that FEMA currently does not

have the statutory authority to implement.  FEMA's authority with respect to setting

premium rates is limited to that given to it by Congress in 42 U.S.C. §§ 4014, 4015.  This

authority does not include any "methods to aid individuals to afford risk-based premiums

under the National Flood Insurance Program through targeted assistance rather than

generally subsidized rates, including means-tested vouchers."  Pub. L. No. 112-141

§ 100236(a)(1).  Therefore, Plaintiff's theory of redressability not only relies on

speculation about whether Congress would consider the results of the affordability study,

but on speculation that Congress will write and pass new legislation specifically giving

Defendants the authority to use these methods.  This lengthy chain of speculative events

required to establish redress for the alleged injuries falls far short of Article III's

requirement that Plaintiff show that it is likely that the relief it requests – that Defendants

be ordered to complete the study and report mandated by Section 236 before

implementing Section 205 – will remedy the injury it alleges Mississippi citizens are

suffering.  *See Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226-

27 (9th Cir. 2008) (allegation that defendant agencies' decision to enter into treaty led to injury not redressable because only the Executive Branch could set aside the treaty).

> ### d. The Court Cannot Compel Compliance With the Commands of Congress in Section 100236

Section 100236 directs that the affordability study be carried out by a specifically-identified, private, non-profit organization for a specific price.[9]  *See* §100236(b), (d) (requiring that the study be performed pursuant to "a contract [with] the National Academy of Sciences" costing "not more than" $750,000).  These requirements are "mandatory directives" with which FEMA is obligated to comply.[10]  Yet, as the Neal Declaration explains, these provisions cannot be satisfied.  When approached by FEMA, NAS responded that it was "unable to enter into a contract at the price and in the time frame set by Congress."  Neal Decl. at ¶ 10.  Thus, Plaintiff's demand that Defendants "act in accordance" with Congress's requirement to complete the affordability study is a request that Defendants spend in excess of the $750,000 limitation to do so.  Because the Court can neither require FEMA to spend more than $750,000 on the study, nor require a

---

[9]  *See* http://www.nasonline.org/about-nas/organization (describing the National Academy of Sciences as a "private nonprofit membership organization[]."  *See also Lombardo v. Handler*, 397 F. Supp. 792, 802 (D.D.C. 1975), *aff'd*, 546 F.2d 1043 (D.C. Cir. 1976) (finding that the National Academy of Sciences is not an "agency" within the Freedom of Information Act because FOIA "was not intended to be applied directly to private entities which merely contract with the government to conduct studies").

[10]  It is a well-established principle of government appropriations law that statutory language stating "not more than" prescribes the "maximum available" funding for a program.  2 Government Accounting Office Principles of Federal Appropriations Law 6-27 (3d ed. 2004) ("GAO Red Book").  "A specifically earmarked maximum may not be supplemented with funds from the general appropriation."  *Id*.; *see Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2192 (2012) (congressionally-specified expenditure maximums "prevent[] . . . reprogramming other funds" for the purpose).  For this reason, the agency and its officials could not simply decide to carry out the study in violation of the $750,000 limitation.  *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990) ("If an executive officer on his own initiative" decides to violate "the statutory bar, the official would risk prosecution.").

private non-party to complete the study at that price, the Court cannot redress any injuries Plaintiff contends others are suffering due to the implementation of Section 205.  *See Monistere v. State Farm Fire & Cas. Co.*, 559 F.3d 390, 394 (5th Cir. 2009) (ordering spending in excess of the statutory cap would "disregard 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury'") (quoting *Richmond*, 496 U.S. at 420).

To be sure, Plaintiff contends that the $750,000 threshold is "no excuse."  Pl.'s Mem. Prelim. Inj. at 17.  Yet the sole case cited by Plaintiff, *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1192 (10th Cir. 1999) provides no authority for the relief Plaintiff seeks. There, the Tenth Circuit rejected EPA's prioritization of obligations where Congress had allocated "inadequate" funds "to accomplish all of [EPA's] required duties."  Here, the issue is not a "[l]ack of . . . monetary allocation," Pl.'s Mem. Prelim. Inj. at 17, but an explicit command by Congress that explicitly limits the amount of funds to be spent on the study, whatever their source.  Under these circumstances, "it would be most anomalous for a judicial order to require a Government official . . . to make an extrastatutory payment of federal funds."  *Richmond*, 496 U.S. at 430.   Absent such an order from this Court, or an order requiring NAS, a non-party, to perform a study for less money than it says it requires to complete the work, Plaintiff's claimed injury cannot be redressed.

**B.  <u>The Studies and Reports Plaintiff Seeks to Compel Are Not Agency Actions and There is Therefore No Jurisdiction Under the APA</u>**

Even if Plaintiff could overcome the legal obstacles discussed above, this Court would still lack jurisdiction to entertain its claims because the action Plaintiff seeks to compel is not "agency action" within the meaning of the APA.  Plaintiff's Amended

Complaint and its memorandum in support of its motion for a preliminary injunction

make clear that Plaintiff is asking this Court to "compel agency action unlawfully

withheld or unreasonably delayed" pursuant to 5 U.S.C. § 706(1).  *See* Am. Compl.

¶¶ 33-41; Pl.'s Mem. Prelim. Inj. at 13-15.  The APA "provides a generic cause of action

to '[a] person suffering legal wrong because of *agency action*, or adversely affected or

aggrieved by *agency action*.'"  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460

F.3d 13, 18 (D.C. Cir. 2006) (quoting 5 U.S.C. § 702) (emphasis added).  *See also Norton*

*v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 62 (2004) (challenging an

agency's "failure to act" is "properly understood as a failure to take an *agency action*"

under 5 U.S.C. § 551(13) (emphasis added)).  "Review under the APA is further limited

to '*final agency action* for which there is no other adequate remedy in a court.'"  *Fund for*

*Animals*, 460 F.3d at 18 (quoting 5 U.S.C. § 704) (emphasis added).  *See also SUWA*, 542

U.S. at 61-62 ("Where no other statute provides a private right of action, the 'agency

action' complained of must be '*final* agency action.'") (quoting 5 U.S.C. § 704)

(emphasis added); *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (review

provisions of the APA limit review to "final agency action") (citing 5 U.S.C. § 704).

Absent a specific and final agency action, a court lacks jurisdiction to consider a

challenge to agency conduct.  *See Sierra Club*, 228 F.3d at 565.

        However, the term "agency action" "is not so all-encompassing as to authorize" a

court "to exercise judicial review over everything done by an administrative agency."

*See Fund for Animals*, 460 F.3d at 19.  In fact, courts have explicitly held that the type of

study and report required by Section 236 of BW-12 is not the type of agency activity that

is reviewable under the APA.  "Much of what an agency does is in anticipation of agency

action.  Agencies prepare proposals, *conduct studies*, meet with members of Congress and interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs."  *See id.* at 19-20 (emphasis added); *Guerrero*, 157 F.3d at 1195 (a report to Congress "is not agency action of the sort that is typically subject to judicial review"); *Ctr. for Biological Diversity v. U.S. Dep't of Energy*, No. C 05-01526 WHA, C 02-00027 WHA, 2005 WL 1656881, at *3 n.4 (N.D. Cal. July 14, 2005) ("the failure to meet congressional reporting obligations does not qualify as a judicially-reviewable agency action") (citing *Guerrero*).

Since a report to Congress is not reviewable "agency action," the completion of a report to Congress is not an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Sierra Club*, 228 F.3d at 565 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  Therefore, it is not action that falls within the APA's waiver of sovereign immunity and this Court does not have jurisdiction over Plaintiff's claims.

### C.  Plaintiff's Challenge to Section 207 Is Not Ripe

Though it is unclear whether Plaintiff seeks to enjoin the implementation of Section 207 of BW-12, this Court would not have jurisdiction over such a claim in any event because it is not ripe.  *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003) (quotation omitted) ("The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.").

In various places the Amended Complaint raises concerns regarding the effect that remapping has had, or will have, on some Mississippi residents.  *See* Am. Compl.

¶¶ 17, 28, 46a.  *See also* Pl.'s Mem. Prelim. Inj. at 6-7 ("It is also pertinent that the Act implements a strategy for remapping the country's flood zones, and that the remapping appears to have started with Mississippi."); 21.  However, whatever remapping Plaintiff might be referring to, it cannot be having any effect that is due to the implementation of BW-12.  Section 207, which requires FEMA to phase in full-risk rates over a five-year period for any property located within an area affected by a revised or updated FIRM, has not yet been implemented by Defendants.  Defendants do not plan to implement Section 207 for at least one year.  *See* Neal Decl ¶ 17.  Therefore, any request to stay implementation of this Section is not ripe for judicial review.  *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 807 (quotation omitted) (ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies."); *id*. at 807-08 (ripeness doctrine "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (quotations omitted)); *Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 413 F.3d 479, 483-84 (5th Cir. 2005) (dismissing challenge to rule as unripe where agency deferred effective date of rule and announced its intent to consider issues raised by plaintiff in new rulemaking during the deferral period).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be granted.

Dated: November 18, 2013                    Respectfully submitted,

                                            STUART F. DELERY
                                            Assistant Attorney General

                                            GREGORY K. DAVIS
                                            United States Attorney

                                            STEPHEN R. GRABEN
                                            Assistant United States Attorney
                                            1575 20th Avenue
                                            Gulfport, MS  39501
                                            Phone:  (228) 563-1560
                                            Fax:  (228) 563-1571
                                            stephen.graben@usdoj.gov
                                            Miss. Bar No.:  4931


                                            /s/ Jennie L. Kneedler
                                            MICHAEL SITCOV
                                            JENNIE L. KNEEDLER
                                            ERIC J. SOSKIN
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave., N.W.
                                            Washington, D.C.  20001
                                            Tel. (202) 305-8662
                                            Fax (202) 616-8470
                                            Email: Jennie.L.Kneedler@usdoj.gov
                                            D.C. Bar # 500261

                                            *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2013 I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of such filing to the following:

Ben H. Stone
Jonathan P. Dyal
Karl C. Hightower
BALCH & BINGHAM
1310 Twenty Fifth Ave.
Gulfport, MS  39501
Phone: (228) 214-0402
Fax:  (228) 864-8221
bstone@balch.com
jdyal@balch.com
kchightower@balch.com

Lee Davis Thames, Jr.
Mississippi Insurance Commission
Woolfolk Bldg.
501 North West St., Ste. 1001
P.O. Box 79
Jackson, MS  39025-0079
Telephone:  (601) 618-3119
lee.thames@mid.ms.gov

*Attorneys for Plaintiff*

/s/ Jennie L. Kneedler